**In the Matter of David W. CALLAGHAN, Debtor.**

**Frank BUNGERT, Plaintiff,**

v.

**David W. CALLAGHAN, Defendant.**

**Bankruptcy No. 83–03845–BE.**
**Adv. No. 83–2233–BE.**

United States Bankruptcy Court, E.D., Michigan, S.D.

Aug. 27, 1984.

Harold R. Goldberg, Detroit, for plaintiff.

Alan P. Goldstein, Southfield, for defendant.

MEMORANDUM OPINION
AND ORDER

STANLEY B. BERNSTEIN, Bankruptcy Judge.

*Findings of Fact*

1. The plaintiff had his son deliver his 1971 Discoverer motor home (motor home) to the defendant C.O.P. Bomar Corporation's (Bomar) service center on October 1, 1980.

2. The only repairs needed to be made at the time of delivery to Bomar were to the motor home's brakes.

3. Within a few days of delivery, the plaintiff authorized the service manager, Robert Chap, to make the brake repairs.

4. Bomar failed to make those repairs in time for the plaintiff to use the motor home on his 45-day vacation in November and December, 1980.

5. Sometime during the winter months of 1980 while the motor home was in Bomar's custody, the vehicle was vandalized and extensively damaged.

6. Sometime during the spring of 1981, the plaintiff's insurance company, working in conjunction with Bomar and the defendant, its service manager, adjusted the claim and authorized repairs in the amount of $2,993.71.

7. The adjusted claim included a $100 deductible payable by the plaintiff.

8. Bomar, acting through its service manager, improperly back-dated the work order from the spring of 1981 to October 1, 1980.

9. In late September of 1981, Bomar accepted payment in the amount of $2,893.71 from the plaintiff's insurance company, deposited the funds in its general corporate account, and used the check's proceeds in its business operations.

10. At the time Bomar accepted the insurance draft, the repairs to the motor home were not completed.

11. On October 5, 1981, Bomar sent a letter to the plaintiff waiving storage fees in consideration for the plaintiff's authorization to make the extensive repairs needed to the motor home; Bomar had previously sent the plaintiff a letter on June 26, asserting storage fees.

12. The repairs were not completed by the end of October, 1981 when the plaintiff was prepared to remove the motor home for his annual 45-day vacation during the months of November and December of 1981.

13. The plaintiff was not able to return to Bomar's service center during the first three months of 1982 to remove his motor home because of a death in his immediate family in January, 1982 and because he suffered a disabling injury in the line of duty as a fireman which caused him to be bedridden during February and March of 1982.

14. The first notice of a claim of a garage keeper's lien for which proof of receipt is established is a notice dated July 7, 1982 from Bomar and signed by the defendant as vice president. The notice admitted that no response had been received from the plaintiff based upon prior efforts to contact the plaintiff by telephone or letter. The notice stated that the motor home would be sold at public auction to satisfy an indebtedness of $100 for the unpaid deductible and storage charges of $6,350.00 from November 1, 1981 to date at a *per diem* charge of $25.00.

15. The defendant testified that a reasonable storage charge at another yard would be $3.00 per day.

16. The defendant testified that the primary dispute with the plaintiff was over the $100 deductible, and that the storage charges would be negotiated or waived.

17. The plaintiff returned to the service center of Bomar after receiving the July 7, 1982 notice to remove his motor home, but could not locate it at these premises.

18. On August 25, 1982, Bomar sent a notice under the defendant's signature, by certified mail, to the plaintiff advising him the public sale of the motor home would be held on September 17, 1982. This second notice was received by the plaintiff on August 30, 1982.

19. Robert King, an individual who resides in Kentucky and purchases used motor homes, submitted a written bid in the amount of $500 for an auction sale to be held on September 10, 1982.

20. Robert King advised Bomar, through the defendant, that he would extend his bid to September 17, 1982.

21. Bomar did not advertise the sale of the motor home in any newspapers of general circulation, nor did it advertise the sale through any trade publications.

22. On September 16, 1982 at 12:10 p.m., the Honorable Maureen P. Reilly issued an ex parte restraining order and order to show cause in Wayne County Circuit Court, Civil Action No. 82–234235 PD, filed by the plaintiff on that same date against Bomar. The order restrained Bomar, its agents, employees, servants, and attorneys from conducting a public auction of the motor home.

23. Leata Hill served a true copy of the summons, complaint, and the restraining order upon Bomar at the service center on September 16, 1982. Ms. Hill filed a proof

of service on September 21, 1982. A certified copy of the summons was admitted as an exhibit.

24. Robert King paid Bomar $500 for the trailer and hauled it away after the sale. The sales proceeds were deposited in the general corporate account and used to meet the expenses of the business.

25. At all relevant times from the date of adjusting the insurance claim through the sale of the motor home, the defendant was an officer and shareholder of Bomar, and was the person primarily responsible for managing the service center, repairing the motor home, assessing charges, and arranging and consummating the sale of the motor home.

26. The value of the motor home was $20,000 as of the date the motor home was delivered to Bomar.

27. Any decline in value in the motor home, apart from depreciation due to the passage of time, was solely attributable to acts of commission or omission by Bomar.

### Conclusions of Law

A. The defendant, acting as an officer of Bomar sold the plaintiff's motor home by private sale for $500 to Robert King on September 17, 1982.

B. The sale was in violation of the public sale requirements of the Garage Keeper's Lien Act, M.C.L.A. § 570.301 *et seq.*, and in violation of a restraining order issued by a court of competent jurisdiction and timely served before the day before the sale on September 16, 1982.

C. The sale was not a commercially reasonable disposition of property which was worth $20,000 in the condition in which it had been delivered to Bomar.

D. The sale was for the purpose of liqui-dating a disputed debt of a mere $100 and storage charges not reasonably exceeding $800.

E. The maximum storage and other charges under the Garage Keeper's Lien Act was $600.

F. Under the circumstances of this case, the sale of the motor home constituted a wilful and malicious injury to the property of the plaintiff because it was intentional and without just cause.

G. As an intentional tort of the corporation, any liability and damages are assessable against an officer who was directly responsible for the tortious conversion of the plaintiff's property.

H. The defendant is personally liable for the damages arising from his performance of the tortious conversion of the plaintiff's property.

I. The damages are $20,796 plus court costs and interest.

### Analysis

The plaintiff's motor home was sold by Bomar; that sale was purportedly authorized under the Michigan Garage Keeper's Lien Act M.C.L.A. § 570.301 et seq. That statutory scheme provides that a garage keeper may assert a lien for labor performed which remains uncompensated; the garage keeper may proceed to sell the repaired vehicle if the lien remains unsatisfied and the lienor complies with the complex procedural requirements set out in the statute. This Court has found that the statutory requirements were not complied with prior to the sale of the plaintiff's vehicle.

The statute requires that a sale to foreclose upon a garage keeper's lien must be done by public auction. M.C.L.A. 570.-302. Neither the statute nor reported Michigan decisions expressly define "public auction," but the concept of the term's meaning is unambiguous.

> An auction is a public sale of property to the highest bidder by one licensed and authorized for that purpose...

Black's Law Dictionary 119 (5th ed.1979). The concept of an auction necessarily implies public participation in bidding. Such participation is logically precluded where there is no public notice prior to the sale.

The defendant here testified that this sale was not advertised in either the newspapers or trade publications. As such, it appears that there was no public notice of this sale. The plaintiff's vehicle was, in actuality, sold at a private sale, and not at a public auction, and thus in violation of the statutory requirements.[1] Requirements for public sales in foreclosure proceedings, like those required under bankruptcy law, are intended to bring the highest possible price for the auctioned goods and to lessen the possibility of abuses in the sale process. The sale of a $20,000.00 motor home for $500.00 is an example of such abuse.

■ The Michigan Supreme Court has determined that a sale under the Garage Keeper's Lien law, without compliance with the statutory requirements constitutes conversion. In *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 104 N.W.2d 360 (1960), the plaintiffs purchased a new Lincoln from the defendant; the car was returned on several occasions because of difficulties with the brakes. Several months later, the car was involved in a collision. The plaintiff returned the vehicle to the dealer and authorized the repairs. The dealer sent the car to a body shop.

The plaintiff sued the dealer and manufacturer alleging that the defective brakes caused the collision. Upon learning of that suit, the body shop requested the plaintiff to sign its work order, which the plaintiff refused to do. The auto remained at the body shop for over two years, and eventually that shop asserted a garage keeper's lien. The car was sold for repairs and storage costs.

The Supreme Court defined conversion:

Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. *Nelson &*

*Witt v. Texas Co.*, 256 Mich 65, 70 [239 N.W. 289].

360 Mich. at 438, 104 N.W.2d 360. The Court explained that liability for conversion does not exist where the actor is privileged to dispose of the collateral. As such, the Court concluded that no conversion existed because "[t]he sale was conducted in *strict compliance* with the provisions of the garage keeper's lien statute." *Id.* at 438–39, 104 N.W.2d 360 (emphasis added). The implication is clear that where there is not strict compliance with the statute, any sale would constitute "an act of dominion wrongfully exerted."

■ Even if Bomar had strictly complied with the requirements of the Garage Keeper's Lien statute, the sale of the plaintiff's motor home still would have constituted conversion. The plaintiff obtained a restraining order from the Wayne County Circuit Court; the complaint, summons and order were personally served upon Bomar's offices the day before the sale. *See* GCR 1963, 105.4(2) (service upon private corporations); GCR 1963, 718.9(4) (scope of injunctions). Service upon the corporate offices was sufficient, especially since the defendant was designated in the corporate records as the resident agent at that address. The sale of the plaintiff's vehicle was in violation of a valid court order and thus, again, was "an act of dominion wrongfully exerted."

■ The defendant-debtor cannot escape liability by asserting that any act of conversion was done by the corporation. The debtor was an officer and shareholder of the closely held corporation and had primary responsibility for the daily operations of the service department. He supervised the arrangements for the work done on the plaintiff's motor home and was the principal actor in the attempted assertion of the garage keeper's lien.

---

1. The sale was additionally defective in that no notice was given to the lienholder of record, National Bank of Detroit. M.C.L.A. 570.302. The Court has not given consideration to that omission because it was not raised by the parties and the Court is unaware of any objections by the bank.

Michigan law on piercing the corporate veil is best summarized in *Kline v. Kline*, 104 Mich.App. 700, 305 N.W.2d 297 (1981).

Generally, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all of the corporation's stock. *Bourne v. Muskegon Circuit Judge*, 327 Mich 175, 191; 41 NW2d 515 (1950). Complete identity of interest between sole shareholder and corporation may lead courts to treat them as one for certain purposes. *Williams v American Title Ins. Co*, 83 MichApp 686; 269 NW2d 481 (1978). Where the corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored. *People ex rel Attorney General v Michigan Bell Telephone Co*, 246 Mich 198, 205; 224 NW 438 (1929). A court may look through the veil of corporate structure to avoid fraud or injustice. *Schusterman v Employment Security Comm*, 336 Mich 246; 57 NW2d 869 (1953). The community of interest between corporation and shareholders may be so great that, to meet the purposes of justice, they should be considered as one and the same. *L.A. Walden & Co v Consolidated Underwriters*, 316 Mich 341, 346; 25 NW2d 248 (1946). When the notion of a corporation as a legal entity is used to defeat public convenience, justify a wrong, protect fraud or defend crime, that notion must be set aside and the corporation treated as the individuals who own it. *Paul v University Motor Sales Co*, 283 Mich 587, 602; 278 NW 714 (1938). The fiction of a corporate entity different from the stockholders themselves was introduced for convenience and to serve the ends of justice, but when it is invoked to subvert the ends of justice it should be and is disregarded by the courts. Paul, supra. A court's treatment of a corporate entity clearly rests on notions of equity, whether it is an action at law or at equity. Each case involving disregard of the corporate entity rests on its own special facts. *Brown Brothers Equipment Co v State Highway Comm*, 51 Mich App 448; 215 NW2d 591 (1974).

104 Mich.App. at 702–03, 305 N.W.2d 297.

The debtor was the primary actor in the conversion of the plaintiff's property. All of the notices to effect the defective lien were executed by him. The debtor arranged and conducted the sale of the vehicles. With the debtor's knowledge of vehicles, he knew that the sale price of the motor home was so grossly inadequate to be beyond any concept of reasonableness. The entire transaction, orchestrated by the debtor, smacks of a grudge match over a $100 insurance deductible balance. The debtor admitted that the storage fees assessed were blatantly unreasonable. He knew that there had been no public notice of the sale and thus the sale could not be considered a public auction as required by law.

■ This Court finds that the transactions between the debtor and the plaintiff were so outrageously conducted by the debtor and those acting under his direction that they must be considered fraudulent. To allow this debtor to shield himself behind the corporation would totally subvert the ends of justice. Judgment against the debtor is hereby entered in the amount of $20,796.00 (the amount of the default judgment entered against Bomar in state court, including costs and attorney fees), plus court costs. Interest at the rate of 12% per annum will begin accruing from the date of entry of this opinion and order. This judgment against the debtor is nondischargeable under 11 U.S.C. § 523(a)(6).

IT IS SO ORDERED.