PEOPLE, *ex rel.* ATTORNEY GENERAL, *v.* MICHIGAN BELL
TELEPHONE CO.

1. CORPORATIONS—SEPARATE ENTITY OF CORPORATIONS IGNORED
WHERE ONE MERE AGENT OF OTHER.

Where a corporation is so organized and controlled and its
affairs so conducted as to make it a mere instrumentality or
agent or adjunct of another corporation, its separate existence
as a distinct corporate entity will be ignored and the two cor-
porations will be regarded in legal contemplation as one unit.

2. SAME—LEGAL OBLIGATIONS MAY NOT BE AVOIDED BY SEPARATE
ENTITIES.

When a corporation exists as a device to evade legal obligations,
the courts, without regard to actual fraud, will disregard the
entity theory.

3. JUDGMENT—RES ADJUDICATA.

In *quo warranto* proceedings by the attorney general on behalf
of the people of the State to oust a telephone company, or-
ganized under State laws, of its franchise, and to determine
its right to credit, in a computation of rates, of the amount
paid to a foreign corporation under a contract, former liti-
gation involving defendant's rates in this State, to which the
present plaintiff was not a party, *held,* not *res adjudicata* of
the questions involved in the instant case.

4. TELEGRAPHS AND TELEPHONES—RATES—STATE CORPORATION NOT
ENTITLED TO CREDIT IN COMPUTATION OF RATES FOR SERVICE PAY-
MENTS TO FOREIGN CORPORATION OF WHICH IT WAS MERELY AGENT.

In *quo warranto* proceedings under 3 Comp. Laws 1915, § 13536
*et seq.,* to oust a telephone company, organized under 2 Comp.
Laws 1915, § 8788 *et seq.,* of its franchise, where the proofs
establish that defendant is only an agent or instrumentality
of a foreign corporation in conducting its business, and that
the purpose of the separate entity is to avoid full investigation
and control by the Michigan public utilities commission, de-
fendant is ousted of its right to have credit, in a computation
of its rates, for payments to said foreign corporation under a
contract calling for a certain per cent. of its gross revenue as
a service charge; under the statute a general judgment of
ouster not being required.

FELLOWS, J., dissenting.

On the general rule that a corporation cannot be formed under
the guise of fiction to evade law, see annotation in 1 L. R. A.
(N. S.) 176.

Information in the nature of *quo warranto* by the people of the State of Michigan, on the relation of William W. Potter, attorney general, against the Michigan Bell Telephone Company to test the validity of defendant's contract with the American Telephone and Telegraph Company. Submitted April 18, 1928.    (Docket No. 177, Calendar No. 32,738.) Judgment of ouster March 29, 1929. Rehearing denied June 20, 1929.

*Wilber M. Brucker,* Attorney General, and *Harold Goodman,* Assistant Attorney General, for plaintiff.

*Stephenson, Butzel, Eaman & Long* (*H. E. Spalding* and *Thomas G. Long,* of counsel), for defendant.

CLARK, J.    This is an information in the nature of *quo warranto,* filed by the people of the State of Michigan on relation of Andrew B. Dougherty, then attorney general, to oust the Michigan Bell Telephone Company, a Michigan corporation, of its franchise. After plea and replication evidence was adduced upon the following, stipulated by counsel to be the issue:

"Whether the defendant exercises its corporate franchises and conducts its business, or such substantial part thereof as to warrant judgment of ouster, subject to the domination and in accordance with and in submission to the dictation of the American Telephone and Telegraph Company, or instead of itself conducting such business permits said American Telephone and Telegraph Company to conduct it, so that the said defendant is merely the instrumentality and form by and under which said American Telephone and Telegraph Company itself conducts such telephone business in the State of Michigan, and said defendant thereby has misused and abandoned its franchises and should, therefore,

by the judgment of this court, be ousted from its corporate rights, privileges and franchises.''

As briefed and submitted for decision, the controversy is reduced, quoting the concluding paragraph of the main brief of the attorney general:

''It is respectfully submitted that this court render a judgment of ouster, unless within a reasonable time the telephone company makes adequate provisions to insure the rendition of the license contract services at no more than a reasonable rate over which the public utilities commission shall be accorded supervision.''

From this and the other briefs it appears that this suit is an attack on the so-called 4½% (later 4%) contract. As gathered from the briefs, the contention of plaintiff is that the services rendered by the American Telephone and Telegraph Company, a corporation, hereinafter called American company, under the so-called license or 4% contract with the Michigan Bell Telephone Company, hereinafter called Michigan company, is an essential part of the telephone business, that such services purporting to be rendered under contract are not in fact so rendered, that the American company, through ownership of nearly all the capital stock of the Michigan company, and through domination, is itself conducting business in the State, that such domination and the surrender by the Michigan company of its telephone business constitute an abuse of the franchise which, unless corrected, warrants forfeiture. The defendant contends that the services rendered under the contract are very valuable, easily worth the 4% of gross revenue paid therefor, that it exercised a proper business discretion in making the contract, and that it is entitled in fixing a rate to credit for the full amount paid pursuant to the contract, to which

plaintiff replies that the contract is pretended, due to domination of the American company, in effect made by it with itself, that it does the business in Michigan, and that the public utilities commission of the State, in fixing a rate, is entitled to have in evidence the American company's actual cost of the services rendered. Apparently, the plaintiff's position is that the cost to the American company of these services, rather than the cost thereof to the Michigan company under the contract, should be the amount of this item considered in rate making.

It is recognized that we have here two corporate entities. Fraud is expressly disclaimed. We are asked to disregard the ''corporate fiction,'' the ''entity theory,'' and to look to the substance on the ground that ''the forms of corporate organization are used to accomplish a violation of law or a result contrary to public policy.''

The information avers, and the plea admits, that the Michigan company was organized and exists under the provisions of chapter 169, 2 Comp. Laws 1915, being Act No. 129, Pub. Acts 1883. Section 4 of the act gives the company, among other things, the power ''to conduct and carry on the business of providing and supervising communication by telephone.'' Section 2 of the act provides: ''The stock, property, and affairs of every corporation organized hereunder shall be managed by its directors.'' The record is\convincing that these provisions are not being observed, but are being violated to the injury of the public. The Michigan company is not conducting and carrying on telephone business in Michigan; the American company is doing it. The board of directors of the Michigan company does not manage the property and affairs of the company; that is done by the American company. The American

company owns 99.99% of the common stock of the Michigan company. Nearly 70 shares are held by certain directors. We quote from a brief:

"In 1911 five great companies, of which the Michigan Company was one, operated with one president for all, practically an identical set of directors, and a single general manager. Comprised in this central group of Bell Telephone Companies were, besides the Michigan Company, the Chicago Telephone Company, the Cleveland Telephone Co., the Wisconsin Telephone Company and the Central Union Telephone Company. Nothing in the minutes of the Michigan Company evidences that arrangement. On April 11, 1911, Mr. Sunny was elected president of the Michigan Company (he was at that time president of four other companies); and on the same date the board of directors, on motion of Mr. Kingsbury, a vice-president of the A. T. & T., unanimously appointed H. F. Hill general manager. He was likewise manager of the four other companies.

"In passing, we direct attention to the fact that every resolution of the board of directors,—the evidence extends from 1911 to date,—was unanimously passed. It is significant that no division of opinion ever appears either in respect to policy or persons nominated.

"This arrangement—the group organization—persisted from 1911 to 1920, when it was terminated in accordance with the view of the A. T. & T. At the meeting of the board of directors, January 30, 1920, the chairman explained the growth of the companies comprising the group and the view of the A. T. & T. as follows:

" 'Since the time of the organization, State utility commissions have been organized in the several States, and rate cases in behalf of some companies have had to be conducted under the auspices of the Chicago headquarters, which, with respect to States other than Illinois, was somewhat objectionable. Under control of State utilities commissions home companies seemed to be in more favorable position than companies managed from other

States. It is now the view of the American Telephone and Telegraph Company that on account of the very large growth of the several properties, the regulation of rates by the State utilities commissions, and because of other considerations, the group idea does not lend itself to the best interests of the respective companies. Therefore it is proposed to officer the Michigan State Telephone Company on a State basis and separate it from the central group.' ''

The Michigan company (then Michigan State, now Michigan Bell) was separated and "officered" accordingly.

Witnesses, officers of both the Michigan and the American company, testified of conclusion that there was no domination of the Michigan company. The record does not support the conclusion. An annual report of the American company states that "an effective common control over all" associated companies was necessary, and that the units "will be closely associated under the control of one central organization exercising all the functions of centralized general administration."

Again:

'' 'Administration' is centralized, it is legislative, determinative of general subjects, supervisory and judicial, acts alike for all branches and divisions and may be located apart from the seats of action.

'' 'Operation' is executive. It is the action, the operation supreme as to local questions but responsible to the central administration. It may be separated into divisions or departments each having operating relations with the other but no lines of authority between them.

"In the Bell system the 'administration' is in the American Telephone and Telegraph Company, the central company. The 'operation' is in the associated companies, each operating on defined lines in distinct territory, each in fact an operating division and no more."

A review of all the evidence is convincing that in the Bell system the Michigan company is merely an operating unit, "operating on defined lines," and the lines, to achieve standardization in method, practice, materials, and equipment, are most minutely defined and are as minutely followed.

The Michigan company is no more engaged in conducting and carrying on a telephone business than is the ordinary station agent engaged in conducting and carrying on the railroad business of his employer. The agent must use reason and intelligence, and has a certain discretion, but it would be remarkable were his "lines" as closely defined as are those of the Michigan company. The admitted purpose of having in this State a separate corporate entity has been stated and quoted.

Where a corporation is so organized and controlled and its affairs so conducted as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit. *In re Muncie Pulp Co.*, 139 Fed. 546; *Interstate Telegraph Co.* v. *B. & O. Telegraph Co.*, 51 Fed. 49; Wormser on Disregard of the Corp. Fiction, 54. When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory. *Higgins* v. *Cal. Pet. & Asp. Co.*, 147 Cal. 363 (81 Pac. 1070); *Brundred* v. *Rice*, 49 Ohio St. 640 (32 N. E. 169, 34 Am. St. Rep. 589); *Donovan* v. *Purtell*, 216 Ill. 629 (75 N. E. 334, 1 L. R. A. [N. S.] 176).

That the Michigan company is a mere agent or instrumentality of the American company is established. We think that it is also apparent that a purpose of the separate entity is to avoid full investigation and control by the public utilities commission of

the State to the injury of the public. The difference in entity going out, the contract goes with it. The American company cannot contract with itself.

It is urged that there is former adjudication by reason of *City of Detroit* v. *Michigan Railroad Commission,* 209 Mich. 395, and *Michigan Public Utilities Commission* v. *Telephone Co.,* 228 Mich. 658. Those were rate cases. A basic and necessary concession involved in the very structure of that litigation was that the Michigan company was conducting and carrying on a telephone business in the State. The purpose of the litigation was to fix its rates in its business in the State. From such concession it followed that the Michigan company had capacity and ability to make the contract in question, and the inquiry respecting it was whether, in view of the relations of the companies, the contract was fair. The plaintiff here was not a party in that litigation, and the adjudications there offer no bar to this action to forfeit franchise. 7 Thompson on Corp. (3d Ed.), p. 840; 6 C. J. p. 816; 15 R. C. L. p. 1029.

Under the statute authorizing this proceeding in *quo warranto* (3 Comp. Laws 1915, § 13536 *et seq.*), a general judgment of ouster is not required. *Attorney General* v. *National Cash Register Co.,* 182 Mich. 99 (Ann. Cas. 1916 D, 638). It may be "an ouster to do the particular act complained of." The sole relief here sought is of the contract in question, that defendant be ousted of right to have credit in a computation of rates for payments to the American company under and as upon the contract. Plaintiff is entitled to the relief.

Judgment of ouster will be entered accordingly.

North, C. J., and Fead, Wiest, McDonald, and Sharpe, JJ., concurred with Clark, J. Potter, J., did not sit.

Fellows, J. (*dissenting*). Admittedly the 4½ per cent. contract (now 4 per cent.) is the sole cause of this litigation. The attorney general, I think, makes it clear in briefs and upon oral argument that he does not desire to paralyze the business of the State by ousting the defendant completely from doing telephone business in the State, and, as I understand the opinion of my Brother Clark, the judgment of ouster he says should be entered does not go so far. In other words, the defendant will "be ousted of right to have credit in a computation of rates for payments to the American company under and as upon the contract." I shall presently consider the propriety of *quo warranto* proceedings to test the validity of the contract, and what I shall now say will be upon the theory that the action is an appropriate one for the purpose.

The original 4½ per cent. contract between the Michigan company and the predecessor of the American Telephone and Telegraph Company (The Bell company) was entered into when that company owned not a share of stock in the Michigan company, and the business relations between the two companies have been substantially the same after as before the American company commenced to buy stock in the Michigan company. The contract was before this court in *City of Detroit* v. *Michigan Railroad Commission,* 209 Mich. 395, and in *Michigan Public Utilities Commission* v. *Telephone Co.,* 228 Mich. 658, and before the United States Supreme Court in *Houston* v. *Southwestern Tel. Co.,* 259 U. S. 318 (42 Sup. Ct. 486), and *Southwestern Bell Tel. Co.* v. *Public Service Com.,* 262 U. S. 276 (43 Sup. Ct. 544, 31 A. L. R. 807). I was disqualified in the *Detroit Case* (209 Mich.), and, of course, did not read the record, although I was somewhat familiar with the proofs. I did sit in the *Utilities Commission Case*

(228 Mich.), and I then read the record in that case, so far as it pertained to the 4½ per cent. contract and the depreciation reserve, and at the same time I read the record in the *Houston Case* (259 U. S.), and the record in the *Southwestern Bell Case* (262 U. S.), so far as they pertained to these subjects. I have read the voluminous record in the instant case with care, and I must confess that upon the question of the 4½ per cent. contract, so far as I am able to discover, the records in all the cases are substantially identical and in many instances the same witnesses appear. In all of the decided cases the American Telephone and Telegraph Company owned all or substantially all of the stock of the local company; in all of the cases this fact was stressed and in all of these cases the validity of the 4½ per cent. contract was sustained. In each of the decided cases, this result was reached having in mind the rule that agreements between the parent and subsidiary companies must be closely scrutinized, and if procured by domination or unfairly, should be disregarded in a rate-making case. But each case recognized that the men who furnish the money to run a business should have some reasonable say as to its proper expenditures and management; as stated by Mr. Justice McReynolds in the *Southwestern Bell Case:*

"It must never be forgotten that while the State may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in *State Public Utilities Commission, ex rel. Springfield,* v. *Springfield Gas and Electric Co.,* 291 Ill. 209, 234 (125 N. E. 891):

" 'The commission is not the financial manager of the corporation and it is not empowered to substitute

its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.' "

I see no reason for reaching a different conclusion in the instant case than that reached in the cases cited.

But forgetting the other cases and taking this record alone, I am satisfied that the State has signally failed to establish domination over the Michigan company in the offensive or illegal sense by the American company. The contract which it is claimed was procured by domination is the same in essentials as the earlier contracts made when the American company and its predecessor had no financial interest in the Michigan company, and is substantially the same as entered into with companies in which it does not own the controlling stock. Speaking from this record and this record alone, I am satisfied the services performed under this contract are worth every dollar the Michigan company pays.

Some of us remember the advent of the telephone, the little exchanges which sprang into being with their crude instruments and cruder service. This record discloses the millions upon millions which have been expended by the American Telephone and Telegraph Company in the development and perfection of telephony, the benefit of which and of future developments are and will be available to defendant under the contract assailed. Mr. Jackson, who was the first president of the Michigan company, and its president in 1887 when the first contract was entered into with the Bell company (predecessor of the A. T. & T. Company), and who is now retired, testifies:

"Well, generally speaking, I may say that I have considered, and I do now consider, that the agree-

ment for the use of the Bell instruments, and all that is implied thereby, is the greatest asset that the Michigan State Telephone Company has."

While of little moment to this case, it is interesting historically to note that in the instant case the attorney general is insisting that the American company come into the State and become domesticated at the peril to the defendant of losing its franchise, and in 1909 the then attorney general insisted that the American company keep out of the State, and this court, in *American Telephone and Telegraph Co.* v. *Secretary of State,* 159 Mich. 195, refused it permission to come into the State and become domesticated. But, of course, times do change.

The remedy by *quo warranto* is an extraordinary remedy. It is resorted to against corporations for violation of the privileges conferred upon them by the State. Complete ouster is not required. In *Attorney General* v. *National Cash Register Co.,* 182 Mich. 99 (Ann. Cas. 1916 D, 638), the defendant was assessed the maximum fine and ousted from continuing its illegal practices, some of which were set up in the opinion. Here the defendant will not be ousted from continuing any illegal practices, because it is not claimed that it has been guilty of any illegal practices; it will be ousted and only ousted of its right in a rate-making case to have credit by the Michigan utilities commission for payments made to the American company pursuant to the terms of the contract. What testimony shall be received, and what credits shall be given by the commission in a rate proceeding before that body is, in the first instance, for the determination of the commission, subject, of course, to judicial review. This court ought not on *quo warranto* oust the defendant or any other corporation from introducing any evidence it sees

fit or asserting any rights it may be advised it has in proceedings had before the administrative boards of the State. If the defendant has ceased to function as a corporation of this State and is but a cloak or dummy under which, and through which, the American company is doing the telephone business of the State (which claim the State, in my judgment, has signally failed to establish), if it is no longer exercising its corporate franchises, it should be ousted *in toto*..

Proceedings in *quo warranto* should not be used to decide for the commission and in advance of a proceeding before it, what evidence shall and what shall not be considered by it, what claims shall be and what claims shall not be considered by that body, if and when it has occasion to act in the future. Nor should such proceeding be used as a club; nor should this court enter a judgment which may under any circumstance be regarded as only a gesture. In my judgment this proceeding should be dismissed, leaving to the commission to decide in the first instance, and subject to judicial review, what it will consider and what it will not consider in rate proceedings which may in the future come before it.