# STATE OF MICHIGAN

# COURT OF APPEALS

SANFORD GREEN, JACK R. HENDRICKSON,
THOMAS ESPER, and LIBWAG, LLC,

Plaintiffs-Appellees,

v

NORMAN H. ZIEGELMAN and NORMAN H.
ZIEGELMAN ARCHITECTS, INC.,

Defendants-Appellants.

FOR PUBLICATION
May 7, 2015
9:00 a.m.

No. 318989
Oakland Circuit Court
LC No. 2012-125245-CZ

Before: M. J. KELLY, P.J., and WILDER and K. F. KELLY, JJ.

M. J. KELLY, J.

In this dispute over the separate existence of a corporate entity, defendants, Norman H. Ziegelman and Norman H. Ziegelman Architects, Inc., appeal by right the trial court's judgment ordering them to pay more than $156,000 to plaintiffs, Sanford Green, Jack R. Hendrickson, Thomas Esper, and Libwag, LLC. On appeal, Ziegelman and Ziegelman Architects contend that the trial court erred when it denied their motion for summary disposition premised on the doctrine of res judicata and erred when it disregarded Ziegelman Architects separate existence from its owner, Ziegelman, and held Ziegelman personally liable for an earlier judgment against Ziegelman Architects. Because we conclude there were no errors warranting relief, we affirm.

## I. BASIC FACTS

This is the second time these parties have appeared before this Court on a matter arising from the underlying events. This Court previously considered an appeal by Ziegelman and Ziegelman Architects from the judgment entered after arbitration in 2006. This Court concluded, in relevant part, that the trial court erred when it used a post-judgment proceeding to disregard Ziegelman Architects' separate existence. See *Green v Ziegelman*, 282 Mich App 292, 303-304; 767 NW2d 660 (2009). The Court declined to consider whether Green, Hendrickson, and Esper would be able to file an independent action asking the trial court to disregard the separate existence of Ziegelman Architects or whether such a claim would be barred by the compulsory joinder rule or res judicata. *Id.* at 305.

-1-

In 2010, Green, Hendrickson, Esper, and Libwag sued Ziegelman and Ziegelman Architects; they asked the trial court in relevant part to disregard the separate existence of Ziegelman Architects and hold Ziegelman personally liable for the 2006 judgment. Ziegelman and Ziegelman Architects moved for summary disposition on the grounds that the claims by Green, Hendrickson, Esper, and Libwag were barred by res judicata and were required to have been joined in the prior suit under MCR 2.203(A), but the trial court denied the motion. The parties later agreed to dismiss the 2010 case without prejudice.

In February 2012, Green, Hendrickson, Esper, and Libwag reinstated their suit against Ziegelman and Ziegelman Architects. They alleged that Ziegelman operated his corporation as his alter ego. Because Ziegelman misused the corporate form, they asked the court to disregard Ziegelman Architects' separate existence and hold Ziegelman personally liable for the 2006 judgment. They also alleged that the transfers violated the Uniform Fraudulent Transfer Act and the Business Corporation Act.

The trial court later entered a stipulated order concerning the 2010 case. In relevant part, the parties stipulated that all actions taken in the 2010 case would be treated as though they occurred in the 2012 case, including all discovery, witness lists, case evaluations, and motions and their corresponding orders. The parties also waived their right to have a jury hear the claims.

The trial court held a bench trial in July 2013. Green testified that Hendrickson originally formed Libwag along with John Domiko. Green later purchased Domiko's interest and, by early 2003, Esper had also acquired a membership. Green said that he, Hendrickson, and Esper intended to use Libwag to develop 13 acres of land on the corner of Liberty and Wagner in Scio Township, Michigan, for technology or light industrial office space.

Green and his partners were looking for a prospective member who might serve as an architect and construction manager in 2003. They met with Ziegelman to discuss bringing him in as a member, using Ziegelman Architects as the architectural firm, and using Ziegelman's construction firm, Continental Construction Company, to build the project. Green said that Ziegelman told him that Ziegelman Architects was a "successful architectural firm that had undertaken numerous large-scale office and apartment projects" and was "an ongoing, successful enterprise." Green relied on Ziegelman's representations about Ziegelman Architects in making the decision to cause Libwag to contract with Ziegelman Architects to provide the designs and supervise the project. Green testified that Libwag entered into an architectural agreement with Ziegelman Architects, which included a fee of approximately $1.4 or $1.45 million, assuming the project would cost around $19.5 million.

After Libwag entered into the agreement with Ziegelman Architects and Ziegelman acquired his membership interest in Libwag, Ziegelman attempted to meet with the other members of Libwag individually. When Ziegelman met with Green, he stated his belief that the project was not going in the right direction and "disparaged" Hendrickson and Esper. He said Green should join his interest with Ziegelman's interest to "carry the day and proceed in the direction that" Ziegelman wanted. Green said that none of them joined with Ziegelman.

After his unsuccessful attempt to seize control of the project, Ziegelman stopped meeting the required capital calls for Libwag and he caused Ziegelman Architects to stop performing under its agreement with Libwag. The disputes eventually resulted in multiple lawsuits, but the members agreed to submit all their claims, including the dispute with Ziegelman Architects, to arbitration. The arbitrators ultimately rejected Ziegelman's claims, reduced his membership interest in Libwag to 7 percent, and provided that Ziegelman Architects had to pay Libwag and the three other members $156,313. A judgment to that effect was entered in May 2006.

Green, Hendrickson, and Esper compelled Ziegelman to appear for a creditor's examination in October 2006. Green attended the examination and learned that Ziegelman Architects had no assets and only $400 in accounts receivable; Ziegelman even stated that, with the exception of a small project for a relative, Ziegelman Architects had not done any architectural work in so many years that he could not remember how long it had been. Had he known about Ziegelman Architect's actual status and history, Green said he would not have agreed to let Libwag enter into the agreement for architectural services.

Ziegelman testified that he was Ziegelman Architects' sole shareholder, director, and officer. The last project that Ziegelman Architects performed was completed in 1989. Ziegelman Architects had been a tenant in a building owned by one of his other entities for at least 20 years, but had no written lease and never paid rent. The entity that owned the building lent approximately $242,000 to Ziegelman Architects over the years. There were, however, no loan agreements, repayment schedules, or notes to evidence these loans and Ziegelman Architects never repaid the loans. He also personally lent an additional $391,000 to Ziegelman Architects, which also was not evidenced by a promissory note and was not repaid. Ziegelman Architects also paid his automobile leases, auto insurance premiums, and his cell phone and travel expenses. Ziegelman agreed that he filed losses on his personal income for the expenses incurred by Ziegelman Architects; in a three-year span, he deducted $151,000.

Ziegelman formed a new architectural entity ten days after the judgment against Ziegelman Architects. Ziegelman admitted that, shortly before the creditor's examination, he purchased all of the assets of Ziegelman Architects—filing cabinets, drafting boards, tables and other officer equipment—for $3,900. The equipment, he stated, was properly valued despite the fact that it was listed as worth $89,690 on a tax return two years earlier. Since then, Ziegelman Architects ceased to exist as an operating business. Ziegelman admitted that one of the reasons he formed the new entity was to "get out from under this judgment." The new entity leases the same space that Ziegelman Architects leased, but again without paying rent. Because the new entity also has no business, it too survives on loans that he makes to it. The new entity pays his car lease, his insurance, his travel, and cell phone expenses as well.

Green, Hendrickson, Esper, and Libwag argued before the trial court that the evidence established that Ziegelman Architects was a sham corporation which existed solely to meet Ziegelman's personal needs and shield him from liability. For that reason, they maintained, the trial court should disregard Ziegelman Architects' separate existence and hold Ziegelman personally liable for the 2006 judgment. Ziegelman and Ziegelman Architects responded that the trial court could not disregard Ziegelman Architects' separate existence because there was no evidence that Ziegelman used the corporate form to cause an unjust injury.

In August 1013, the trial court entered its bench opinion and judgment. The court stated that Ziegelman Architects was "grossly undercapitalized" when it entered into the contract whose breach gave rise to the 2006 judgment. It found that Ziegelman abused the corporate form by using Ziegelman Architects "as a mere instrumentality or as his alter ego." He did not observe the "required corporate formalities," and, in order to avoid paying on the judgment, Ziegelman created a new entity and fraudulently transferred assets to it. The court further found that Ziegelman used Ziegelman Architects to "commit a fraud or illegality" and resulted in an unjust loss. The court concluded that the findings warranted disregarding the separate existence of Ziegelman Architects and amounted to a fraudulent transfer and a violation of the Business Corporation Act. Accordingly, it held Ziegelman and Ziegelman Architects jointly and severally liable for the 2006 judgment of $156,313.

In September 2013, Ziegelman and Ziegelman Architects moved for relief from judgment, which the trial court denied.

Ziegelman and Ziegelman Architects now appeal in this Court.

## II. SUMMARY DISPOSITION

## A. STANDARDS OF REVIEW

Ziegelman and Ziegelman Architects first argue that Green, Hendrickson, Esper, and Libwag could have—and should have—brought their claims premised on Ziegelman's misuse of the corporate form in the original lawsuit that led to an arbitration award, which was reduced to a judgment in 2006. For that reason, they maintain, the trial court erred when it denied their motion for summary disposition under the doctrine of res judicata. This Court reviews de novo a trial court's decision on a motion for summary disposition. *Yono v Dep't of Transportation (On Remand)*, 306 Mich App 671, 676-677; 858 NW2d 128 (2014). This Court also reviews de novo the trial court's application of legal doctrines, such as the doctrine of res judicata. *Washington v Sinai Hosp of Greater Detroit*, 478 Mich 412, 417; 733 NW2d 755 (2007).

## B. RES JUDICATA

The judiciary created the doctrine of res judicata to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Pierson Sand and Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 380; 596 NW2d 153 (1999) (quotation marks and citations omitted). To that end, a second action will be barred under res judicata "when (1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *Dart v Dart*, 460 Mich 573, 586; 597 NW2d 82 (1999).

In the present case, there is no dispute that the same parties or their privies were involved in the 2006 litigation. It is also undisputed that the claims actually litigated in the 2006 litigation did not involve whether Ziegelman misused the corporate form. Rather, as discussed in the arbitration award, the parties' disputes involved the breach of various agreements—Libwag's operating agreement, the architect agreement between Libwag and Ziegelman Architects, and the construction agreement between Libwag and Continental Construction—and a claim of

-4-

copyright infringement by Ziegelman Architects. See *Green*, 282 Mich App at 295-296. Hence, the issue on appeal is whether Green, Hendrickson, Esper, and Libwag could have submitted the claims at issue in the present litigation for resolution in the 2006 litigation.

Michigan courts have broadly applied res judicata to bar "not only claims already litigated, but every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Dart*, 460 Mich at 586. We will not, however, use res judicata to "lighten the loads of the state court by precluding suits whenever possible"—we employ it "to promote fairness." *Pierson Sand and Gravel*, 460 Mich at 383. Accordingly, this Court applies the same transaction test "pragmatically, by considering whether the facts are related in time, space, origin or motivation, and whether they form a convenient trial unit." *Adair v State of Michigan*, 470 Mich 105, 125; 680 NW2d 386 (2004) (quotation marks, emphases, alterations, and citation omitted). If the new claim or claims arise from the same group of operative facts as the previously litigated claim or claims, even if there are variations in the evidence needed to support the theories of recovery, we will treat the claims as the same and res judicata will apply. *Id.* at 124.

In order to prevail on their motion for summary disposition, Ziegelman and Ziegelman Architects had the initial burden to demonstrate that Hendrickson, Green, Esper, and Libwag could have brought their claim concerning Ziegelman's misuse of Ziegelman Architects in the 2006 litigation. *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). Because it was not evident on the face of the complaint that the doctrine of res judicata applied, Ziegelman and Ziegelman Architects had to present evidence to support this motion. *Yono*, 306 Mich App at 679-680.

In their brief in support of the motion, Ziegelman and Ziegelman Architects cited one exhibit—the judgment from the 2006 litigation—and concluded: "The piercing theory which the plaintiffs would now present in their newly filed case could certainly have been litigated in that case." They did not discuss evidence concerning whether Hendrickson, Green, Esper, or Libwag knew or should have known that Ziegelman was misusing Ziegelman Architects as a mere instrumentality or that they had any other basis for concluding that Ziegelman could be held personally liable for the claim against Ziegelman Architects. Further, they did not raise any other evidence at the hearing on the motion. See *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 380 n 8; 775 NW2d 618 (2009). Because Ziegelman and Ziegelman Architects did not present evidence that, if left unrebutted, would warrant application of the doctrine of res judicata, the trial court properly denied the motion. *Id.* at 370; see also *Yono*, 306 Mich App at 696-697. Moreover, even considering the additional arguments and evidence discussed in their brief on appeal, Ziegelman and Ziegelman Architects have not shown that res judicata bars the claim at issue.

In denying the motion for summary disposition predicated on res judicata, the trial court stated that res judicata did not apply because the piercing the veil theory "was not and could not have been arbitrated in the prior lawsuit because it was not included in the Arbitration Agreement." As Ziegelman and Ziegelman Architects aptly argue on appeal, the fact that the parties chose not to include that issue in their agreement to arbitrate does not settle whether that issue *could* have been raised in the 2006 litigation. Rather, whether a claim could have been litigated is subject to a reasonable person standard: whether a party "exercising reasonable

diligence" could have raised the claim, even if the actual party or parties neglected to do so. *Dart*, 460 Mich at 586. Consequently, it is irrelevant that the parties did not provide for the arbitration of Ziegelman's personal liability for Ziegelman Architects' breach of the architectural agreement; the sole question is whether Green, Hendrickson, Esper and Libwag could have done so in the exercise of reasonable diligence.

In the 2006 litigation, the operative facts involved the parties' performance of various contractual obligations. The evidence from that litigation shows that Green, Hendrickson, and Esper knew that Ziegelman was the sole shareholder of Ziegelman Architects and understood that he would perform the architectural services involved in the agreement between Libwag and Ziegelman Architects. As such, they knew that Ziegelman Architects would primarily act through its agent, Ziegelman, and that any acts or omissions in the performance of Ziegelman Architects' obligations would likely be acts or omissions committed through Ziegelman. There is also evidence that they so identified Ziegelman with his entities that they occasionally failed to distinguish between acts that Ziegelman took on his own behalf and acts that he took on behalf of Ziegelman Architects. But, contrary to Ziegelman and Ziegelman Architects' contention on appeal, the evidence that Green, Hendrickson, Esper, and Libwag occasionally equated Ziegelman with Ziegelman Architects and apparently understood that Ziegelman's acts or omissions were the acts and omissions of Ziegelman Architects does not, by itself, warrant disregarding the separate existence of Ziegelman Architects.

Under Michigan law, Green, Hendrickson, Esper, and Libwag had an obligation to respect Ziegelman Architects' separate existence. *Wells v Firestone Tire and Rubber Co*, 421 Mich 641, 650; 364 NW2d 670 (1984). And the fact that Ziegelman's acts or omission might have amounted to a breach of the architectural agreement between Libwag and Ziegelman Architects did not necessarily render Ziegelman personally liable for that breach. See *Bailey v Schaff (On Remand)*, 304 Mich App 324, 347-350; 852 NW2d 180 (2014) (explaining that a third-party cannot hold an agent personally liable for the acts or omissions that the agent took on behalf of his or her principal unless the third-party demonstrates that the agent's acts or omissions also amounted to a breach of a duty that the agent separately owed to the third-party), vacated not in relevant part, 497 Mich 927. Accordingly, in the absence of evidence that Ziegelman breached a separate and distinct duty owed to Green, Hendrickson, Esper or Libwag while acting on Ziegelman Architects' behalf or so misused Ziegelman Architects that a court would be justified in disregarding its separate existence, any claim that Ziegelman should be held personally liable for Ziegelman Architects' failure to perform under the architectural agreement would have been frivolous. See MCR 2.114(D) and (F); MCR 2.625(A)(2); MCL 600.2591.

The 2006 litigation primarily involved whether the individuals and entities at issue breached their contractual obligations. Because the operative facts involved the parties' performance under the agreements, Green, Hendrickson, Esper, and Libwag had no reason to question Ziegelman's historical operation of Ziegelman Architects. The undisputed evidence showed that, from all outward appearances, Ziegelman Architects had an ongoing business with significant assets and an independent source of revenue. It was not until after the 2006 litigation ended in a judgment against Ziegelman Architects that Green, Hendrickson, Esper, and Libwag had any basis for concluding that Ziegelman misused Ziegelman Architects in such a way as to warrant disregarding its separate existence.

In addition, Ziegelman did not abandon Ziegelman Architects until after the trial court entered its judgment in the 2006 litigation. The evidence showed that Ziegelman created a new entity, which he caused to cover the expenses previously supplied by Ziegelman Architects. He even moved its one employee to the payroll of another entity. As long as Ziegelman continued to use Ziegelman Architects to supply his auto lease and insurance, to pay his assistant, and to cover various expenses, he would have had to infuse capital into Ziegelman Architects because Ziegelman Architects had no revenue and insufficient assets to independently cover all of Ziegelman's expenses. If Ziegelman were to pay cash into Ziegelman Architects after the judgment to cover Ziegelman Architects' expenses, Hendrickson, Green, Esper, and Libwag could have executed against the payments to cover the judgment. But as Ziegelman admitted, he created a new entity to avoid that possibility. By establishing a new entity to cover the expenses previously provided by Ziegelman Architects, Ziegelman was able to abandon Ziegelman Architects and evade its creditors without the loss of any of the benefits provided by that entity.

Considering the operative facts from the transaction involved in the 2006 litigation, Green, Hendrickson, Esper, and Libwag had no reason to believe that they had a viable claim premised on piercing the corporate veil. Therefore, the present claim was not part of that transaction and res judicata does not apply. Although the trial court erred to the extent that it premised its decision on the parties' failure to include the claim in their arbitration agreement, the trial court nevertheless came to the correct result. See *Fisher v Blankenship*, 286 Mich App 54, 70; 777 NW2d 469 (2009).

## III. SUFFICIENCY OF THE EVIDENCE

### A. STANDARDS OF REVIEW

Ziegelman and Ziegelman Architects next argue that the trial court erred when it determined that Green, Hendrickson, Esper, and Libwag established grounds for disregarding Ziegelman Architects' separate existence. Because they also failed to establish separate grounds for holding Ziegelman personally liable for the judgment, Ziegelman and Ziegelman Architects maintain, the trial court erred when it entered a judgment that made Ziegelman personally liable for the 2006 judgment. This Court reviews de novo the trial court's application of equity to disregard the separate existence of an artificial entity. *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005). This Court, however, reviews for clear err the factual findings underlying a trial court's application of equity. *Johnson v Johnson*, 363 Mich 354, 357; 109 NW2d 813 (1961). This Court also reviews de novo whether the trial court properly selected, interpreted, and applied the relevant statutory provisions. *Huntington Nat'l Bank v Daniel J Aronoff Living Trust*, 305 Mich App 496, 507; 853 NW2d 481 (2014).

### B. PIERCING THE CORPORATE VEIL

#### 1. THE LAW

A corporation—or other artificial entity—is a legal fiction. *Bruun v Cook*, 280 Mich 484, 495; 273 NW 774 (1937). It is " 'an artificial being, invisible, intangible, and existing only in contemplation of law.' " *Id.*, quoting *Trustees of Dartmouth College v Woodward*, 17 US (4 Wheat) 518, 636; 4 L Ed 629 (1819). Courts honor this fiction by indulging a presumption—

often referred to as the corporate veil—that the entity is separate and distinct from its owner or owners. *Seasword v Hilti, Inc (After Remand)*, 449 Mich 542, 547-548; 537 NW2d 221 (1995). Courts will honor this presumption even when a single individual owns and operates the entity. *Bourne v Muskegon Circuit Judge*, 327 Mich 175, 191; 41 NW2d 515 (1950). "However, the fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts." *Wells*, 421 Mich at 650; see also *Paul v University Motor Sales Co*, 283 Mich 587, 602; 278 NW 714 (1938) ("[W]hen the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."). As such, a court sitting in equity may look through the "veil of corporate structure"—that is, pierce the corporate veil—"to avoid fraud or injustice." *Kline v Kline*, 104 Mich App 700, 702; 305 NW2d 297 (1981).

Relying on *Rymal v Baergen*, 262 Mich App 274, 293-294; 686 NW2d 241 (2004), Ziegelman and Ziegelman Architects argue that Hendrickson, Green, Esper, and Libwag had to prove that Ziegelman abused Ziegelman Architects' separate existence to commit a wrong, which caused them an unjust loss. Because Hendrickson, Green, Esper, and Libwag failed to present such evidence, they contend the trial court erred when it determined that Hendrickson, Green, Esper, and Libwag established grounds for disregarding Ziegelman Architects' separate existence. Ziegelman and Ziegelman Architects' reading of the elements suggests that a court would not be justified in disregarding the separate existence of an entity unless there is evidence that the owner caused the entity itself to commit a particular wrong; however, that understanding does not accurately reflect the law.

In an early case, our Supreme Court stated that it would disregard an artificial entity's separate existence when it "is so organized and controlled, and its affairs so conducted, as to make it a mere instrumentality or agent or adjunct of another" person or entity. *People ex rel Potter v Mich Bell Tel Co*, 246 Mich 198, 204; 224 NW 438 (1929). But even when an entity is operated as a mere instrumentality by its owner, courts will only intervene to prevent an injustice: "When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory." *Id.* Because the evidence showed that American Telephone and Telegraph operated Michigan Bell as a mere instrumentality and did so to "avoid full investigation and control by the public utilities commission of the State to the injury of the public," the Court disregarded the separate existence of Michigan Bell and voided the contract between Michigan Bell and American Telephone and Telegraph. *Id.* at 204-205. It was unnecessary to show that the owners used the entity *directly* to commit a fraud or other wrong; it was sufficient to show that the continued recognition of the entity's separate existence under the circumstances would amount to a wrong or be contrary to public policy. *Id.*

Similarly, in *Old Ben Coal Co v Universal Coal Co*, 248 Mich 486, 489, 492; 227 NW 794 (1929), our Supreme Court disregarded the separate existence of Universal Coal, which was operated as a mere instrumentality of its parent, Price Hill Collier Company. The Court did not require proof that Price Hill used Universal Coal to commit a particular fraud or wrong, but rather stated that a court could "ignore a mere colorable corporate entity to the end that the rights of third parties shall be protected." *Id.* at 492 (quotation marks and citation omitted). Because the evidence showed that Price Hill operated Universal Coal as a mere instrumentality to sell its

coal and evade liability to its buyers should it choose to do so, it was appropriate to disregard its separate existence and hold it liable for Universal Coal's obligations. *Id.* at 489, 492.

The Supreme Court returned to the requirements for piercing the corporate veil in *Gledhill v Fisher & Co*, 272 Mich 353; 262 NW 371 (1935). In that case, George Gledhill and his wife sought to have the court disregard the separate existence of an entity that had purchased land from them on land contract and hold that entity's parent corporation liable on the land contract. *Id.* at 356. Justice Bushnell, writing for the majority, stated that courts would not disregard the separate existence of an entity unless three criteria were established:

> Before the corporate entity may be properly disregarded and the parent corporation held liable for the acts of its subsidiary, I believe it must be shown not only that undue domination and control was exercised by the parent corporation over the subsidiary, but also that this control was exercised in such a manner as to defraud and wrong the complainant, and that unjust loss or injury will be suffered by the complainant as the result of such domination unless the parent corporation be held liable. The rule is correctly stated . . . as follows: But to justify treating the sole stockholder or holding company as responsible it is not enough that the subsidiary is so organized and controlled as to make it 'merely an instrumentality, conduit or adjunct' of its stockholders. It must further appear that to recognize their separate entities would aid in the consummation of a wrong. [*Id.* at 357-358 (quotation marks and citation omitted).]

Under this formulation of the test, the complainant must establish that the entity was the mere instrumentality of the owner, that the owner exercised his or her control in such a manner as to defraud or wrong the complainant in some way, and that the complainant would suffer an unjust loss or injury unless the court disregards the separate existence of the entity from its owner. *Id.* Justice Bushnell further stated that this test was consistent with the decisions in *Mich Bell* and *Old Ben Coal*. *Id.* at 356-357. In *Mich Bell*, he explained, the Court disregarded the separate existence of Bell Telephone because the parent corporation dominated Bell Telephone and used it to justify rates that were not based on the real costs of the public utility—that is, Bell Telephone was an instrumentality and the continued recognition of its separate existence would amount to a public wrong by allowing the utility to evade regulation of its prices. *Id.* at 357. Similarly, in *Old Ben Coal*, the parent corporation used the subsidiary for the fraudulent purpose of defeating the satisfaction of a judgment against the subsidiary. *Id.*

Turning to the facts of the case, Justice Bushnell determined that the evidence did not warrant disregarding the separate existence of the entity that entered into the land contract with Gledhill and his wife. *Id.* at 358-359. He explained that Gledhill and his wife were fully aware that they were dealing with an entity and that entity's capital was initially adequate and it paid a significant sum on the land contract. *Id.* at 359. Further, Gledhill and his wife would have been adequately secured against loss were it not for the depreciation in land values caused by the depression, which could not be foreseen. *Id.* at 359, 361. Because there was no evidence that the parent corporation operated the entity as a tool or agent or that it was not organized in good faith to purchase the property, the lower court erred when it disregarded its separate existence. *Id.* at 364.

After the decision in *Gledhill*, our Supreme Court issued opinions in which it reiterated that courts might disregard the separate existence of an entity when the owner's improper domination of the entity resulted in an inequity to an innocent third-party, which could only be rectified by disregarding the separate existence of the entity. See *Acton Plumbing & Heating Co v Jared Builders, Inc*, 368 Mich 626; 118 NW2d 956 (1962); *Cinderella Theatre Co, Inc v United Detroit Theatres Corp*, 367 Mich 424; 116 NW2d 825 (1962); *Herman v Mobile Home Corp*, 317 Mich 233; 26 NW2d 757 (1947); *Paul*, 283 Mich at 602-603. However, adopting Justice Bushnell's formulation from *Gledhill*, this Court later stated that three elements must be met before a court will be justified in disregarding the entity's separate existence; the party requesting relief must prove: "(1) control by the parent to such a degree that the subsidiary has become its mere instrumentality; (2) fraud or wrong by the parent through its subsidiary; and (3) unjust loss or injury to the claimant." *Maki v Copper Range Co*, 121 Mich App 518, 525; 328 NW2d 430 (1982), citing in relevant part *Gledhill*, 272 Mich at 357-358.

Relying on the test first stated in *Maki*, this Court has since repeatedly stated that a complainant must show that the entity was the mere instrumentality of the owner and that the owner used the entity to commit a fraud or wrong resulting in an unjust loss or injury. See, e.g., *Rymal*, 262 Mich App at 293-294, citing *Foodland Distributors v Al-Naimi*, 220 Mich App 453, 457; 559 NW2d 379 (1996), quoting *SCD Chemical Distributors, Inc v Medley*, 203 Mich App 374, 381; 512 NW2d 86 (1994), quoting *Nogueras v Maisel & Associates of Michigan*, 142 Mich App 71, 86; 369 NW2d 492 (1985), citing *Maki*, 121 Mich App at 524-525. Our Supreme Court, however, has never held that a complainant must prove that the owner of an entity used the entity to commit a specific fraud or wrong. While causing an entity directly to commit a fraud or wrong would likely meet the test, as originally stated in *Gledhill*, courts can disregard the separate existence of an entity if the owner's exercise of dominion over the entity was "in such a manner as to defraud or wrong the complainant." *Gledhill*, 272 Mich at 358. Consistent with its discussion of the decisions in *Mich Bell* and *Old Ben Coal*, the Supreme Court required proof that the owner exercised its control over the entity in a *manner* that would amount to a fraud or wrong under the circumstances such that a court "would aid in the consummation of a wrong" if it were to honor the separate existence of the entity. *Id.* (citation and quotation marks omitted).

In *Maki*, this Court paraphrased the fraud or wrong element as requiring proof that there was a fraud or wrong by the owner *through* the subsidiary, which was consistent with the formulation stated in *Gledhill*. *Maki*, 121 Mich App at 525. But, in subsequent recitations, this Court restated the elements from *Maki* as one involving proof that the owner " 'used [the entity] to commit a fraud or wrong.' " *Foodland*, 220 Mich App at 457, quoting *SCD Chemical*, 203 Mich App at 381. Although the distinctions are subtle, the difference between the formulation in *Rymal* and that in *Gledhill* could be understood to require a more onerous proof than required under our Supreme Court's precedents; namely, to require proof that the owner deliberately caused the entity to commit a particular fraud or wrong. However, we do not agree that the Court in *Rymal* intended to alter the test first stated in *Gledhill*, which remains binding on this Court.[1] See *Tyra v Organ Procurement Agency of Michigan*, 302 Mich App 208, 223; 850

_____

[1] Some Justices have expressed interest in granting leave to consider the proper scope of the test for piercing the corporate veil. See *L&R Homes, Inc v Jack Christenson Rochester, Inc*, 475

NW2d 667 (2013). The test stated in *Gledhill* is also consistent with our Supreme Court's admonition that there is no mechanical test for determining when the existence of a separate entity must be disregarded and its statement that whether to disregard the separate existence of an entity depends on the totality of the circumstances. See *Klager v Robert Meyer Co*, 415 Mich 402, 411-412; 329 NW2d 721 (1982) (warning that the test is not to be applied in a "mechanistic fashion" and stating that the "entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused"); see also *Brown Bros Equipment Co v State Hwy Comm'n*, 51 Mich App 448, 452; 215 NW2d 591 (1974) ("In ascertaining whether the separate corporate entity should be disregarded each case is Sui generis and must be decided in accordance with its own underlying facts.").

Using the test stated in *Gledhill* as the foundation, when considering whether to disregard the separate existence of an artificial entity, a court must examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner that the entity was employed in the dealings at issue. *Klager*, 415 Mich at 411-412; *Rymal*, 262 Mich App at 294; *Brown Bros*, 51 Mich App at 452. From this evidence, the trial court must determine whether the evidence establishes that the owner operated the entity as his or her alter ego—that is, as a sham or mere agent or instrumentality of his or her will. See *Seasword*, 449 Mich at 548; *Gottlieb v Arrow Door Co*, 364 Mich 450, 452; 110 NW2d 767 (1961) (noting that there was no proof of fraud, sham, or other improper use of the corporate form" to justify disregarding the entity at issue); *Mich Bell Tel*, 246 Mich at 204. It then must determine whether the manner of use effected a fraud or wrong on the complainant. *Gledhill*, 272 Mich at 358. In considering this element, it is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong the complainant. *Id.*; see also *Foodland*, 220 Mich App at 459-460 (agreeing that there was evidence that the defendants used the corporation to commit fraud, but noting that courts may disregard the separate existence of an entity when the owner manipulated his or her ownership to the prejudice of an innocent third party even in the absence of fraud); *Soloman v Western Hills Dev Co (After Remand)*, 110 Mich App 257, 264; 312 NW2d 428 (1981) ("Although it is clear that the corporate form may be disregarded to prevent injustice and to reach an equitable result, we believe that the injustice sought to be prevented must in some manner relate to misuse of the corporate form short of fraud or illegality."). But it bears repeating that establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence. *Gledhill*, 272 Mich at 359-361. Finally, the trial court must determine whether the wrong would cause the complainant to suffer an unjust loss. *Id.* at 359. If disregarding the separate existence would harm innocent third-parties, it may be just to allocate the loss to the complainant, notwithstanding the wrong. *Kline*, 104 Mich App at 704. Similarly, a loss is not unjust if the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge. *Klager*, 415 Mich at 415 n 6 ("[A] plaintiff may not seek to disregard the corporate entity when he is fully aware of the character of the

Mich 853, 853-854; 713 NW2d 263 (2006) (Corrigan, J., dissenting); *Daymon v Fuhrman*, 474 Mich 920, 920 (Taylor, J., dissenting), 920-921 (Corrigan, J., dissenting); 705 NW2d 347 (2005). But until our Supreme Court does so, we must apply *Gledhill* and its progeny.

corporation with which he deals . . . .").  If considering the totality of the equities, the trial court would be consummating the wrong by honoring the entity's separate existence, the court may disregard the entity's separate existence.  *Gledhill*, 272 Mich at 358.

## 2.  APPLYING THE LAW

The evidence adduced at trial amply supported the trial court's determination that Ziegelman used Ziegelman Architects as his alter ego or as a mere instrumentality of his will.  *Seasword*, 449 Mich at 548.  There was a very close correspondence of identity between Ziegelman and Ziegelman Architects; he was the sole owner, director, and officer of Ziegelman Architects.  He was also its sole staff-architect.  There was another employee who might have served as a receptionist, but the evidence showed that Ziegelman was Ziegelman Architects' primary agent.  As such, when it acted, it acted through Ziegelman.  Ziegelman Architects was ostensibly in the business of providing architectural services to the public, but, with the exception of a minor project for one of Ziegelman's relatives, Ziegelman Architects had not undertaken a single project since the completion of its last project in 1989.

Because it had no revenue from operations, Ziegelman Architects was entirely dependent on Ziegelman for cash to pay its expenses.  And the evidence showed that over the years Ziegelman—in his personal capacity or through another entity—lent over $630,000 to Ziegelman Architects to cover its expenses.  Despite loaning hundreds of thousands of dollars to Ziegelman Architects, Ziegelman never caused Ziegelman Architects to execute a note or repay any of the funds.  Similarly, Ziegelman caused another entity to lease space to Ziegelman Architects for approximately 20 years, but Ziegelman Architects did not have a written lease and did not pay rent.  The fact that Ziegelman Architects was entirely dependent on Ziegelman's support to continue its operations—such as they were—also strongly suggests, when considered in light of Ziegelman Architects' expenses, that Ziegelman Architects existed merely to serve as Ziegelman's alter ego.

There was evidence to support an inference that Ziegelman used Ziegelman Architects to cover his personal expenses, notwithstanding his testimony that the expenses were all related to his (unsuccessful) efforts to find business for the firm over the past decade.  He used Ziegelman Architects to pay his automobile lease and insurance, cell phone bill, travel expenses, and used it to purchase thousands of dollars of supplies for his sculpting hobby.  He claimed that he intended to sell the sculptures on behalf of his architectural firm, but admitted that he had not sold any sculptures.  The evidence showed that Ziegelman Architects reported losses every year and Ziegelman claimed those losses on his personal tax return.  He admitted that in one three-year span he claimed more than $150,000 in losses from Ziegelman Architects.

There was also evidence that Ziegelman had not properly maintained Ziegelman Architects' corporate formalities over the years.  He did not keep minutes for any meetings of shareholders, directors, or officers.  Although he caused another of his entity's to loan money to Ziegelman Architects and personally lent money to it, Ziegelman never formalized those transactions and never caused Ziegelman Architects to repay the loans.  Ziegelman also had one of his other entities lease space to Ziegelman Architects, but again he did not formalize the relationship and Ziegelman Architects never paid rent.  The lack of formality in Ziegelman's dealings with Ziegelman Architects suggests that Ziegelman himself disregarded Ziegelman

Architects' separate existence whenever it was convenient or suited his needs, but asserted its separate existence when it benefited him personally, such as for tax purposes.

The totality of the evidence supported the trial court's determination that Ziegelman operated Ziegelman Architects as his alter ego or as a mere instrumentality. *Gledhill*, 272 Mich at 358.

The record evidence also supports the conclusion that Ziegelman exercised his control over Ziegelman Architects in a manner that caused a fraud or wrong. There was testimony and evidence that Hendrickson, Green, and Esper approached Ziegelman in his individual capacity to join Libwag because they needed someone with significant financial resources and with a background in architecture and construction. However, before Ziegelman would agree to purchase an interest in Libwag, he insisted on having extra control over the development project and insisted that Libwag hire his architectural services through Ziegelman Architects. Green testified that during these preliminary negotiations Ziegelman led them to believe that Ziegelman Architects was a going concern with numerous successful projects. Green stated that he got a favorable impression from the visit to Ziegelman Architects' office because the office had drawings and scale models which suggested that the firm was currently engaged in business. And when he expressed concern that the firm appeared to have only one additional employee, Ziegelman told him that he used independent contractors.

Although Ziegelman denied having made any misrepresentations about Ziegelman Architects to Hendrickson, Green, or Esper, the evidence tended to support Green's version of events, and the trial court was free to believe Green and disregard Ziegelman's explanations as incredible. MCR 2.613(C). Green and his partners were planning a development that was estimated to cost more than $19 million and which would include approximately $1.4 million in architectural fees; yet, Ziegelman testified that they never inquired about Ziegelman Architects' financial condition, its current projects, or its ability to meet its obligations under the architectural agreement that Ziegelman insisted Libwag execute with Ziegelman Architects. Because of his close identity with Ziegelman Architects, the trial court was free to infer that Ziegelman did in fact misrepresent Ziegelman Architects' financial condition and that he did so in both his individual capacity and as the sole owner, director, officer, and architect for Ziegelman Architects. Green also testified that, were it not for these misrepresentations, he would not have agreed to allow Libwag to engage Ziegelman Architects for its architectural services. Thus, the trial court could find that Ziegelman used his control over Ziegelman Architects to mislead Libwag's members into entering into an architectural agreement with Ziegelman Architects at a time when Ziegelman Architects ability to perform and meet its financial obligations was entirely subject to Ziegelman's whim—if Ziegelman elected not to perform under the architectural agreement, Ziegelman Architects would not perform; if Ziegelman elected not to fund Ziegelman Architects, Ziegelman Architects would cease paying its ongoing expenses and its creditors would be left to suffer whatever loss might be occasioned by Ziegelman Architects' failure to perform. And the evidence shows that this is precisely what happened in this case.

The record evidence showed that, after Ziegelman began to have disputes with the other members of Libwag, he used his membership to hinder the other members' efforts to proceed with the project and caused Ziegelman Architects to cease performing under the terms of its architectural agreement. These disputes eventually led to the arbitration in the 2006 litigation and the arbitrators determined that Ziegelman Architects breached its architectural agreement with Libwag, which resulted in more than $156,000 in losses. After Hendrickson, Green, Esper, and Libwag reduced the arbitration award to a judgment, Ziegelman abandoned Ziegelman Architects. Because Ziegelman Architects depended on cash infusions by Ziegelman to pay its expenses, Ziegelman could no longer operate it to pay his professional and sculpting expenses and pass on the tax benefits without risking the possibility that his new cash infusions would be seized to pay the judgment. As he candidly admitted at trial, he formed a new limited liability company to avoid that possibility. Ziegelman formed the new entity to pay his personal expenses, transferred its one employee to the new entity and later to another entity, and purchased all the furniture and other personal property owned by Ziegelman Architects. The new entity performed every function that Ziegelman Architects had previously performed, occupied the same space, and even used the same personal property. Ziegelman then refused to fund Ziegelman Architects as he had done in the past, which left it uncollectible.

The evidence supported a finding that Ziegelman exercised his control over Ziegelman Architects in a manner that wronged Hendrickson, Green, Esper, and Libwag. *Gledhill*, 272 Mich at 358. He misled them into believing that Ziegelman Architects was a viable going concern when he knew that Ziegelman Architects had no independent source of income with which to pay contingent liabilities. He then caused Ziegelman Architects to breach its agreement with Libwag after he began to quarrel with the other members of Libwag and he did so with full knowledge that he could render Ziegelman Architects uncollectible. He also caused Ziegelman Architects to sue Libwag over alleged copyright infringement, again with the knowledge that he could abandon Ziegelman Architects at any moment and thereby render any judgment against it worthless. Given the evidence, the trial court's determination that Ziegelman misused Ziegelman Architects and that his misuse amounted to a fraud or wrong on Hendrickson, Green, Esper, and Libwag was supported by the evidence. *Id.*

Finally, there was evidence to support the trial court's determination that Hendrickson, Green, Esper, and Libwag suffered a loss as a result of the wrong caused by Ziegelman's exercise of control over Ziegelman Architects. The arbitrators determined that Ziegelman Architects breached the architectural agreement with Libwag and caused more than $150,000 in losses to it and its members. The evidence showed that Ziegelman—acting on behalf of Ziegelman Architects—actually caused those damages and made Ziegelman Architects uncollectible. From the evidence of how Ziegelman operated Ziegelman Architects, the trial court could reasonably conclude that Ziegelman himself regarded Ziegelman Architects as a sham entity that existed only to suit his personal needs and which could be discarded with impunity. A reasonable trial court examining these equities could conclude that it would be unjust to allow the loss to stand because, by failing to disregard Ziegelman Architects separate existence from Ziegelman, the trial court would consummate the wrong that Ziegelman perpetrated through his control of Ziegelman Architects. *Id.*

The trial court did not err when it disregarded Ziegelman Architects separate existence and made Ziegelman personally liable for the judgment against Ziegelman Architects. Because the trial court did not err when it disregarded Ziegelman Architects' separate existence and held Ziegelman personally liable for the 2006 judgement, we need not address whether the trial court erred when it determined that Ziegelman could also be liable for violating the Uniform Fraudulent Transfer Act, MCL 566.31 *et seq.*, or the Business Corporation Act, MCL 450.1101 *et seq*.

## IV. CONCLUSION

The trial court did not err when it denied the motion for summary disposition by Ziegelman and Ziegelman Architects premised on the doctrine of res judicata. The trial court also did not err when it elected to exercise its equitable power to disregard the separate existence of Ziegelman Architects from its owner, Ziegelman, and held him personally liable for the 2006 judgment.

Affirmed. As the prevailing parties, Green, Hendrickson, Esper, and Libwag may tax their costs. MCR 7.219(A).


/s/ Michael J. Kelly
/s/ Kurtis T. Wilder
/s/ Kirsten Frank Kelly