2024 IL App (1st) 231062-U

THIRD DIVISION
September 25, 2024

No. 1-23-1062

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| STOCKBRIDGE 600 WEST JACKSON, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 20 L 10295 |
| INDUSTRIOUS NATIONAL MANAGEMENT | ) | |
| COMPANY LLC, INDUSTRIOUS CHI 600 WEST | ) | |
| JACKSON STREET LLC, and ASSEMBLE JACKSON, | ) | Honorable |
| LLC, | ) | Mary Colleen Roberts, |
| | ) | Judge Presiding. |
| Defendants-Appellants. | | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Lampkin and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County in favor of a landlord and against the sole member of the tenant limited liability company where veil piercing was proper under applicable law.

¶ 2    Industrious Chi 600 West Jackson Street LLC (Industrious Jackson), a Michigan limited liability company, leased commercial space in Chicago from landlord Stockbridge 600 West Jackson, LLC (Stockbridge Jackson).  Pursuant to membership agreements, Industrious Jackson provided individuals and entities—referred to as "members"—access to the leased space and

related amenities for a monthly fee. After Industrious Jackson ceased paying rent, Stockbridge Jackson filed an action in the circuit court of Cook County against three defendants: Industrious Jackson; Industrious Jackson's predecessor-in-interest, Assemble Jackson, LLC (Assemble Jackson); and Industrious Jackson's sole owner, Industrious National Management Company LLC (Industrious National). Stockbridge Jackson alleged that the defendants breached the lease and that assets of Industrious Jackson—*i.e.*, the members—were fraudulently transferred to Industrious National. Following a bench trial, the circuit court entered a $2.35 million judgment jointly and severally against the defendants.

¶ 3    The defendants acknowledge that Industrious Jackson and Assemble Jackson are liable to Stockbridge Jackson for the unpaid rent and related amounts. The defendants maintain, however, that the circuit court erred in finding Industrious National liable under veil-piercing and fraudulent transfer theories. As discussed below, we affirm the judgment of the circuit court.

¶ 4                                    BACKGROUND

¶ 5                            *The Building and the Lease*

¶ 6    Convention Center Drive, LLC (CCD) owned a commercial building at 600 West Jackson Street in Chicago (the 600 building). In 2015, CCD executed a lease of the first floor of the 600 building with the predecessor of tenant Assemble Jackson.

¶ 7    Stockbridge Jackson, a Delaware limited liability company which operates in Illinois, purchased the building from CCD in 2017. Stockbridge Jackson is a subsidiary of Stockbridge Capital Group, a multi-billion-dollar firm which invests in commercial real estate on behalf of entities such as pension funds and teachers' unions.

¶ 8    After various amendments, Assemble Jackson (as tenant) agreed to pay approximately $34,000 per month for more than 12,000 square feet of commercial space in the 600 building.

The lease term was set to expire in September 2030.

¶ 9                                    *The Assignment of the Lease*

¶ 10    Industrious National, a Delaware limited liability company, is a flexible workspace provider, which offers office space to individuals and organizations referred to as "members." In 2018, Assemble Jackson and two other Assemble entities were purchased by Industrious National or one of its subsidiaries.

¶ 11    Stockbridge Jackson was approached by Industrious National regarding the possibility of a lease assignment, *i.e.*, replacing Assemble Jackson as the tenant. Industrious National provided financial documents to Stockbridge Jackson, including profit/loss statements and balance sheets. In an email sent on June 15, 2018, Industrious National employee Olivia Feldman represented, in part:

> "To give additional context, we do not have debt or credit lines. Our mature units are cash flow positive and average 92 to 94% occupancy across the portfolio with greater than 30% margins. All new equity is going towards capex (new locations), which means in a downturn we can turn off growth like a faucet and continue operating our portfolio without raising additional capital since each unit is cash flow positive."

Industrious National also sent news articles touting its financial strength, *e.g.*, an article entitled "Industrious raises $80 million to grow its premium coworking spaces across the U.S."

¶ 12    In August 2018, the lease was assigned in writing from Assemble Jackson to a subsidiary of Industrious National: Industrious Jackson, a single-member limited liability company which was organized under Michigan law in June 2018. Stockbridge Jackson executed a document consenting to the assignment.

¶ 13                                    *The Default*

¶ 14    After the lease assignment in 2018, Industrious Jackson paid its monthly rent to Stockbridge Jackson through March 2020, which coincided with the implementation of restrictions related to the COVID-19 pandemic in the United States.  On April 30, 2020, Stockbridge Jackson sent a notice of default to Industrious Jackson which acknowledged the impact of the pandemic and noted that "reasonable accommodations may be possible."  The parties then engaged (unsuccessfully) in negotiations regarding accommodations.  Stockbridge Jackson sent another notice of default on May 29, 2020, which stated, in part, that it intended to enforce the provisions of the lease which required the payment of its attorney fees and costs.

¶ 15    Following additional negotiations, Stockbridge Jackson was informed in August 2020 that the Industrious Jackson location in the 600 building would be "shut down." Industrious National denied any responsibility under the lease—as it was not a party to the lease—and indicated that Industrious Jackson effectively had no assets.

¶ 16                                    *The Lawsuit*

¶ 17    On September 25, 2020, Stockbridge Jackson filed a verified complaint in the circuit court of Cook County against the defendants.  After multiple amendments, the verified second amended complaint was the operative complaint.

¶ 18    In the operative complaint, Stockbridge Jackson alleged that Industrious Jackson failed to observe corporate formalities and was an alter ego of its sole member, Industrious National. According to Stockbridge Jackson, Industrious Jackson did not have its own employees or hold corporate meetings, and its operations were completely controlled by Industrious National. Stockbridge Jackson also alleged that the signatory on the lease assignment had been represented to be Industrious National—a well-capitalized company—whereas the agreement was ultimately

executed by Industrious Jackson. As alleged in the operative complaint, Industrious Jackson and Industrious National "freely and frequently move[d] money" between the two entities.

¶ 19 Stockbridge Jackson further alleged that, once the decision was made to shut down operations at the 600 building, the members (*i.e.*, the individuals and entities which paid Industrious Jackson to utilize the coworking space in the 600 building) were informed that they should leave the 600 building and instead work out of one of the other seven offices operated by Industrious National in Chicago. Industrious National retained a local moving company to move members to other locations. Based on the foregoing, Stockbridge Jackson alleged that Industrious National "horizontally siphoned assets" between Industrious Jackson and other subsidiaries by communicating to its members, who were the primary source of revenue for rent payments to Stockbridge Jackson, to move from the 600 building to other Industrious locations.

¶ 20 The operative complaint included three counts. Count I asserted a claim for violation of the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2020)) (UFTA) against Industrious National. Count II—filed against Industrious Jackson and Assemble Jackson— alleged breach of the lease and/or the assignment. Count III was a breach of contract claim against Industrious National, based on an alter ego theory, *i.e.*, that Industrious Jackson was the mere alter ego of Industrious National and thus they shared contractual obligations under the lease and assignment. The parties agree that Industrious Jackson and Assemble Jackson are liable on count II.

¶ 21 Industrious National filed a motion to dismiss the operative complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2020)). As to the alter ego count, Industrious National noted that there were no allegations that Industrious Jackson lacked governing documents or operating agreements or that it failed to keep records and file annual

reports. Industrious National noted that Industrious Jackson had paid the rent from 2018 until the start of the pandemic in 2020. According to Industrious National, Industrious Jackson was funded by its own operations and, if needed, received capital infusions from Industrious National, its sole member. Industrious National also observed that the default notices from Stockbridge Jackson were directed to Industrious Jackson, and not Industrious National.

¶ 22    The circuit court denied the motion to dismiss and Industrious National's subsequent motion for reconsideration. The matter eventually proceeded to a bench trial, where the testimony and other evidence included the following.

¶ 23                                   *Trial Testimony*

¶ 24    Elizabeth Kirley (Kirley), senior vice president at Stockbridge Capital Group, testified regarding Stockbridge's agreement to the assignment of the lease from Assemble Jackson to Industrious Jackson. Based on Industrious National's communications and financial documents, Stockbridge assumed it was "getting a tenant that had strong credit" and $70 million in the bank.

¶ 25    Kirley was questioned regarding various Slack messages—produced during discovery— which had been transmitted among Industrious National employees when the parties were negotiating financial concessions in the summer of 2020.[1] The Slack messages suggested that certain Industrious National employees believed that Stockbridge was "playing ball" and had offered "insane" (*i.e.*, very generous) terms, but that the Industrious strategy was to suggest a "BS proposal" and to "make them an offer they won't accept." Kirley opined that the 600 building location was not performing strongly even before the pandemic; she believed that Industrious did not negotiate in good faith and instead used the pandemic as an "excuse."

---

[1] Industrious National employee Rebecca Kaufman testified that Slack, a business messaging app, served as "an informal communication channel for us to *** talk internally and collaborate a bit more easily."

¶ 26    Kirley also testified regarding Slack messages among Industrious National employees about a moving company which had been retained to potentially move members.  The employees indicated that, when asked to assess the space and to provide an estimate, the movers were directed to wear plain clothing and to be discreet.  One message indicated that a mover suggested he would falsely represent himself to be an insurance adjuster.

¶ 27    According to Kirley, other Slack messages among Industrious National employees indicated that the pandemic did not cause the financial issues at the 600 building location. One employee wrote: "It's not so much a COVID-specific issue, but that the COVID-induced economic downturn has exposed deals that were weak to begin with, and they cannot weather downturn without significant resource drain."  Kirley testified that Industrious National prepared a "strategy and shutdown script" dated July 2, 2020, wherein company management stated they were "comfortable sacrificing landlord relationships," including the relationship with Stockbridge Jackson.

¶ 28    Kirley also testified regarding a Slack message from an in-house attorney for Industrious National which discussed legal advice received by the company for retaining customers by moving them from underperforming locations to other locations.  The message referred to two options: (1) assigning the membership agreements and transferring the related security deposits; and (2) terminating the membership agreements, returning the security deposits, and asking the members to sign new agreements.  The in-house attorney relayed that the second option presented fewer veil-piercing concerns than the first option, but the way to "eliminate" the concerns was for the subsidiaries to pay or to receive, as applicable, the fair market value of the membership agreements.

¶ 29    Rebecca Kaufman (Kaufman), a former senior director of strategy and business

development at Industrious National, testified regarding "Project Blue." Project Blue was a code name for a company initiative to support the execution of shutdowns for multiple locations, including the 600 building location. According to Kaufman, an internal Project Blue document stated, in part: "Notifying members and moving them to other Industrious locations prior to beginning termination discussions with the landlord in order to retain members is not an option." Kaufman testified that if a member intended to relocate to another Industrious location, Industrious Jackson would refund their security deposits (and *not* transfer the deposit to another Industrious location).

¶ 30    Kerry Butz (Butz), a former employee of an Industrious National subsidiary who was previously employed by Assemble, worked as a community manager at the shared office space at the 600 building from late 2016 until its closure in late 2020. She was responsible for the day-to-day operations at Industrious Jackson. Butz testified that Industrious National, which was located in New York, coordinated all building repairs and coordinated and paid for the telephone service, computers, and other technology for Industrious Jackson. She confirmed that Industrious Jackson did not perform its own marketing or have its own human resources department.

¶ 31    According to Butz, there were between 100 and 200 members at the 600 building location in 2019, and each member paid between $500 and $6000 per month for access to the shared office space. Butz testified that she and her colleagues continued to sign up new members in the summer of 2020 when they knew that the location was going to shut down. When asked if "the reason for signing those new members up and not telling them this location would soon be shut down was because you all knew you could transfer them to other Industrious locations down the street or across the river," Butz responded in the affirmative.

¶ 32    During cross-examination, Butz clarified the shutdown process.  The memberships were terminated at the 600 building location.  Any member who wished to join another Industrious location was required to sign a new membership agreement at the other location.  The terminated members had a choice whether to sign with another location; Butz confirmed that "a few" members signed with other locations.

¶ 33    Clem Turner (Turner), chief legal counsel for Industrious National, testified that Industrious Jackson was created for the purpose of acquiring the assets of Assemble Jackson, the prior tenant of the 600 building.  The acquired assets included the lease and the fees generated from the members.  He acknowledged that Industrious National was the sole member of Industrious Jackson and had the ability to exercise complete authority over Industrious Jackson.  According to Turner, approximately 100 different limited liability companies (including Industrious Jackson) "roll up" into Industrious National.  Turner testified that Industrious National's business strategy included the creation of a limited liability company at each location.

¶ 34    During cross-examination, Turner testified that Industrious Jackson initially informed its members on September 28, 2020, that the company was planning to terminate the memberships.  According to Turner, the terminations—which occurred on October 30, 2020—relieved the members of "any and all obligations" to Industrious Jackson.

¶ 35    Justin Stewart (Stewart), the president and cofounder of Industrious National, testified the company had made "tens of millions of dollars" in member fees, and that the company leased millions of square feet of real estate at 160 different locations throughout the United States.

¶ 36    According to Stewart, Industrious Jackson had sufficient funds to pay rent in April 2020 but made a conscious decision not to pay.  He testified that the location was "bleeding cash," and, in hindsight, the acquisition of the Assemble entities—including Assemble Jackson at the

600 building location—was a poor business decision. Stewart referred to the pandemic as "one variable" which contributed to the closing, but he acknowledged that Industrious Jackson was losing money prior to the pandemic. He confirmed that Project Blue shut down between 8 and 10 locations. When questioned about the employee Slack messages regarding the "discreet" movers, he testified that the employees' conduct was dishonest.

¶ 37    During cross-examination, Stewart testified that the pandemic was "catastrophic" to the Industrious portfolio. According to Stewart, the occupancy at some locations dropped to zero and averaged 15% to 20% "on the high end."

¶ 38    After the court denied the defendants' motion for a directed finding as to the UFTA count (count I), Ashley Robinson (Robinson), the vice president and controller for Industrious National, testified. She testified that Industrious Jackson had its own federal tax identification number and maintained its own bank account at Wells Fargo, as did each of the subsidiaries of Industrious National. While Industrious Jackson had separate financials, it was not subject to a "standalone" audit; rather, the company was audited in conjunction with a consolidated audit. According to Robinson, Stockbridge Jackson never asked for a standalone audit of Industrious Jackson or a guarantee by another entity.

¶ 39    Robinson testified that Industrious National placed "a lot of casual funding" into Industrious Jackson at the beginning of 2020, as the parent was trying to help the subsidiary pay its rent. According to Robinson, Industrious National infused $430,000 into Industrious Jackson in 2020.

¶ 40    During cross-examination, Robinson was questioned regarding a newsletter article in October 2020 which reported that an Industrious entity had newly leased 52,000 square feet of space in Willis Tower in Chicago—the same month that the 600 building operations ceased.

¶ 41    The deposition testimony of M. Todd Henderson (Professor Henderson) was provided to the circuit court. Professor Henderson, a professor at the University of Chicago Law School, was retained by Industrious National to provide an expert report regarding veil piercing. Professor Henderson represented that "everybody" in the commercial real estate industry uses special purpose entities (SPEs)—companies created to fulfill a specific, narrow purpose—like Industrious Jackson. According to Professor Henderson, landlords enter long-term leases with entities with "very few assets, no separate business operations, and those tenants are limited to just that particular entity." He noted that the landlords are also typically corporations "created solely for this purpose." Professor Henderson testified that "the Industrious SPE" (Industrious Jackson)—like the Stockbridge SPE (Stockbridge Jackson)—had the building address in its name "to reinforce with absolute certainty this is just about this place, there's nothing else."

¶ 42    Professor Henderson rejected the proposition that the failure to pay debts could constitute "abuse" for purposes of a veil-piercing analysis. After noting that corporate formalities are not the same for a corporation as a limited liability company, he opined that the aim of a limited liability company is "a more flexible governance structure." Professor Henderson also testified that the funds in this case flowed the wrong way for a veil-piercing analysis: "I don't think I've ever seen any case ever anywhere in which there were not substantial financial movements of monies from subsidiaries, that is the parties seeking to preserve its limited liability, up to shareholders."

¶ 43                    *Posttrial Submissions and Judgment*

¶ 44    In its posttrial submission, Stockbridge Jackson maintained that Industrious National utilized Industrious Jackson as a mere instrumentality to conduct its business and fraudulently transferred Industrious Jackson's sole revenue-generating assets—its members—to its other

locations. The defendants' submission characterized the matter as "a simple case of landlord regret," *i.e.*, Stockbridge Capital Group, a sophisticated real estate business, made a calculated decision for its subsidiary Stockbridge Jackson to enter a lease with Industrious Jackson, an SPE, without securing a parental guarantee from Industrious National.

¶ 45 The circuit court entered a judgment in favor of Stockbridge Jackson and jointly and severally against the defendants. As to the fraudulent transfer count against Industrious National (count I), the circuit court found that Industrious Jackson transferred its members to other Industrious entities without receiving reasonably equivalent value in exchange for the transfer. The circuit court further found that the transfer left Industrious Jackson with "unreasonably small" assets. As to the breach of contract count against Industrious National (count III), the circuit court found that (a) Industrious Jackson was a "mere instrumentality" of Industrious National; (b) Industrious Jackson was used to commit a wrong or fraud, *e.g.*, the disguised movers, the "BS proposals" and negotiation offers "they won't accept," and the transfer of the members from the 600 building; and (c) Stockbridge Jackson suffered an unjust injury, *i.e.*, but for the transfer of the assets from Industrious Jackson to Industrious National, the rent could have been paid. The circuit court thus concluded that the "[c]orporate [v]eil is pierced and liability is assigned" to Industrious National.

¶ 46 The circuit court awarded back rent in the amount of $1,624,059, which reflected the mitigation from a subsequent lease with a third party. Stockbridge Jackson was also awarded $735,000 in attorney fees and costs pursuant to the lease. The defendants filed this appeal.

¶ 47                                    ANALYSIS

¶ 48 The defendants contend that the circuit court erred in ruling in favor of Stockbridge Jackson and against Industrious National on both its veil-piercing and fraudulent transfer claims.

Stockbridge Jackson argues that the evidence presented during the bench trial proved that the defendants engaged in a "coordinated scheme to fraudulently transfer assets and otherwise abuse the corporate form." As discussed below, we affirm the circuit court's judgment with respect to the breach of contract count against Industrious National based on an alter ego/veil piercing theory (count III), and we thus need not address the defendants' contentions as to the fraudulent transfer count (count I).

¶ 49                                    *Standard of Review*

¶ 50    The standard of review of a circuit court's judgment following a bench trial is whether that judgment is against the manifest weight of the evidence. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. "Under the manifest weight standard, a trial court's decision in a bench trial is subject to considerable deference." *In re Z.L.*, 2021 IL 126931, ¶ 82. See also *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27 (noting that a trial judge is the trier of fact in a bench trial and is "in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive"). A judgment is against the manifest weight when it appears from the record that the judgment is unreasonable, arbitrary, not based on evidence, or the opposite conclusion is apparent. *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 25. We will not disturb the findings and judgment of the trial court if there is any evidence in the record to support such findings. *Staes and Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. Accord *Vician*, 2016 IL App (2d) 160022, ¶ 27 (observing that "if the record contains evidence to support the trial court's judgment, that judgment should be affirmed").

¶ 51                                    *Veil Piercing*

¶ 52    According to Stockbridge Jackson, Industrious National fraudulently and wrongfully abused the limited liability company form such that it is liable for the breach of the lease and the

assignment agreement. We agree with the parties that Michigan law governs our analysis of this veil-piercing claim, as Industrious Jackson is a limited liability company organized under Michigan law. *E.g.*, *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 957 (2008) (applying Delaware law to analyze a veil-piercing claim involving a Delaware limited liability company).

¶ 53    Under the Michigan Limited Liability Company Act, unless the articles of organization state that the business of the limited liability company is to be managed by managers, "the business of the limited liability company shall be managed by the members." M.C.L.A. 450.4401. As noted above, the sole member of Industrious Jackson is Industrious National. The same act states: "Unless otherwise provided by law or in an operating agreement, a person that is a member or manager, or both, of a limited liability company is not liable for the acts, debts, or obligations of the limited liability company." M.C.L.A. 450.4501. The default rule under Michigan law is thus that Industrious National would not be liable for the debts of Industrious Jackson, *i.e.*, there is a presumption that the limited liability company form will be respected. See *Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 275 (W.D. Mich. 2017).

¶ 54    The law of veil piercing, however, provides a mechanism for penetrating Industrious Jackson's limited liability company shield to hold its sole member, Industrious National, liable for its debt to Stockbridge Jackson. *Lakeview Commons v. Empower Yourself*, *LLC*, 290 Mich. App. 503, 509 (2010) (noting that a court "can ignore this corporate fiction when it is invoked to subvert justice"); *Green v. Ziegelman*, 310 Mich. App. 436, 452 (2015) (observing that when an entity is operated as a mere instrumentality by its owner, a court will intervene to prevent an injustice).

¶ 55    To justify the piercing of a corporate veil under Michigan law, (1) the entity must be a mere instrumentality of another individual or entity; (2) the entity must have been used to

commit a wrong or fraud; and (3) there must have been an unjust injury or loss to the plaintiff. *Florence Cement Co. v. Vettraino*, 292 Mich. App. 461, 469 (2011). Accord *Ryan Racing*, 231 F. Supp. 3d at 275. Michigan courts have made clear that the same rules apply to determine whether the corporate veil of a limited liability company should be pierced. *Florence Cement*, 292 Mich. App. at 468-69 (citing *Lakeview Commons*, 290 Mich. App. at 510 n. 1).

¶ 56                                              Mere Instrumentality

¶ 57    As noted above, a plaintiff "must show that the entity was the mere instrumentality of the owner and that the owner used the entity to commit a fraud or wrong resulting in an unjust loss or injury." *Green*, 310 Mich. App. at 455-56. To determine whether one entity is the mere instrumentality of another, courts applying Michigan law have examined "(1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham." *Ryan Racing*, 231 F. Supp. 3d at 277 (quoting *Glenn v. TPI Petroleum, Inc.*, 305 Mich. App. 698, 716 (2014)). "Michigan courts have also considered the commingling of funds and the extent to which the shareholder controlled the decisions of the entity." *Id*.

¶ 58    The foregoing factors, however, are not exhaustive. "[W]hen considering whether to disregard the separate existence of an artificial entity, a court must first examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner in which the entity was employed in the matter at issue." *Green*, 310 Mich. App. at 458. See also *S&S Innovations Corp. v. UUSI, LLC*, No. 1:18-cv-1377, 2021 WL 2070064, at *3 (W.D. Mich. May 24, 2021) (noting that "courts must consider all relevant facts that make up the totality of the circumstances"). "From this evidence, the trial court must determine whether the evidence

establishes that the owner operated the entity as his or her alter ego—that is, as a sham or mere agent or instrumentality of his or her will." *Green*, 310 Mich. App. at 458.

¶ 59    Industrious National is the sole member and 100% owner of Industrious Jackson. The trial testimony revealed that Industrious Jackson did not have its own employees or officers, did not hold meetings, and did not negotiate its own contracts.  Industrious National controlled the day-to-day operations for Industrious Jackson, such as coordinating repairs, handling technology issues, and preparing marketing materials.  While Industrious Jackson had a separate bank account and financial statements, the testimony suggested that funds flowed freely between the parent and subsidiary, *e.g.*, the controller testified regarding "a lot of casual funding" from Industrious National.  Industrious National also made the decisions which directly led to this litigation, including the decisions to not use available funds to pay rent to Stockbridge Jackson, to create and implement the plan to transfer members to other locations as part of Project Blue, and to ultimately close the 600 building location.  When asked whether Industrious National "has the ability to exercise complete authority" over Industrious Jackson, the chief legal counsel for Industrious National responded in the affirmative.

¶ 60    In sum, the trial court's finding that Industrious Jackson was a "mere instrumentality" of Industrious National is supported by the record.  See *Florence Cement*, 292 Mich. App. at 460 (stating that "where members do not treat an artificial entity as separate from themselves, neither will this Court").  We turn to the next element: whether Industrious Jackson was used to commit a fraud or wrong.

¶ 61                                        Fraud or Wrong

¶ 62    To prove the "fraud or wrong" element of its veil-piercing claim, Stockbridge Jackson was required to establish that Industrious National engaged in deliberate wrongful conduct that

either was designed to or did produce injury to Stockbridge Jackson. See *Lim v. Miller Parking Co.*, 560 B.R. 688, 705 (E.D. Mich. 2016) (applying Michigan law). A plaintiff is not required to show fraud to pierce the corporate veil. *Ryan Racing*, 231 F. Supp. 3d at 282. It is also not necessary to prove that the parent company caused the subsidiary to directly harm the plaintiff; it is sufficient that the parent company exercised its control over the subsidiary "in such a manner as to wrong" the plaintiff. *Green*, 310 Mich. App. at 458.

¶ 63    The trial testimony supports the conclusion that Industrious National engaged in obfuscation or deception vis-à-vis Stockbridge Jackson. Despite Industrious Jackson being the ultimate signatory on the lease assignment in 2018, Stockbridge Jackson was provided with profit/loss statements and balance sheets for Industrious National. This information, when coupled with media articles regarding Industrious National's financial strength, falsely suggested that Industrious National would become the tenant on the lease. Even Industrious National's president acknowledged that an email from employee Olivia Feldman during the assignment negotiations—regarding each unit being cash-flow positive—contained inaccurate information.

¶ 64    The evidence presented at trial indicated that Industrious National then continued to exercise control over Industrious Jackson to wrong Stockbridge Jackson. Although funds were available to pay rent in April 2020, Industrious National decided that Industrious Jackson would not make the payment. When Industrious Jackson defaulted, Stockbridge Jackson offered generous concessions to retain Industrious Jackson as a tenant. The Slack messages exchanged among Industrious National employees, however, revealed that the company did not engage in good-faith negotiations. Rather, Industrious National appears to have used delay tactics to buy time to strategize. The result was Project Blue, a confidential plan to shed underperforming locations while retaining members.

¶ 65    The evidence further indicated that Industrious National's wrongful conduct vis-à-vis Stockbridge Jackson extended to the closing of the 600 building location. As Ashley Robinson testified, the member fees were the sole source of revenue for Industrious Jackson. Nevertheless, Industrious Jackson decided to attempt to move the members from the 600 location to one of the other seven Industrious locations in Chicago, effectively draining Industrious Jackson of funds with which to pay rent. The local movers hired to assess the 600 building location for a potential move were instructed to wear plain clothing and to be discreet, presumably to not arouse suspicion on the part of Stockbridge Jackson—conduct which the president of Industrious National testified was dishonest. Despite its knowledge that the location was closing, Industrious National had Industrious Jackson continue to sign up new members in the summer of 2020, with the seeming expectation that those members could be moved to other locations in Chicago. Finally, against the advice of counsel, the other locations did not pay fair market value, or any amount, for those transferred memberships.

¶ 66    In sum, Industrious National caused Industrious Jackson to use the leased space for months without paying rent while scheming to move the members who provided the sole revenue for the rent (other than any capital infusions). The evidence at trial provided ample support for the court's conclusion that Industrious National exercised its control over Industrious Jackson "in such a manner as to wrong" Stockbridge Jackson. See *Green*, 310 Mich. App. at 458.

¶ 67                              Unjust Loss or Injury

¶ 68    Finally, the trial court was required to determine whether the fraud or wrong caused Stockbridge Jackson to suffer an unjust loss. See *Florence Cement*, 292 Mich. App. at 471. Here, Stockbridge Jackson suffered a significant loss due to Industrious National treating Industrious Jackson as a mere instrumentality. See *id.* As noted above, the president of

Industrious National testified that a decision was made not to pay the April 2020 rent, despite the availability of sufficient funds. While engaging in negotiations with Stockbridge Jackson to ostensibly maintain the lease, Industrious National devised a plan to attempt to move members and to close the Industrious Jackson location (and other locations). Although "a loss is not unjust if the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge" (*Green*, 310 Mich. App. at 459), the evidence presented at trial suggested that Stockbridge Jackson did not possess such knowledge.

¶ 69     As the president of Industrious National acknowledged, "the members were paying rent, Stockbridge was paying its mortgage on the building, and the only one not paying was Industrious Jackson during that time." The trial court reasonably concluded that, but for Industrious National's conduct, Industrious Jackson would have had adequate funds to pay Stockbridge Jackson.

¶ 70                                    CONCLUSION

¶ 71     We recognize that the act of establishing a limited liability company "for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." *Green*, 310 Mich. App. at 459. See also *Maki v. Cooper Range Co.*, 121 Mich. App. 518, 524 (1982). We also recognize that veil piercing is a remedy which should be invoked sparingly. *S&S Innovations Corp*, 2021 WL 2070064, at *6. Under the specific facts of this case, however, the trial court's conclusion that Industrious National was liable for breach of the lease under a veil piercing theory was not against the manifest weight of the evidence. We thus need not address the parties' contentions regarding the UFTA.

¶ 72     The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 73     Affirmed.