*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CAMBRIDGE REAL ESTATE, LLC, and
MICHAEL HAMAME

      Plaintiffs-Appellees,

v

THE CINCINNATI INSURANCE COMPANY,

      Defendant-Appellant,

and

IAQ MANAGEMENT SERVICES, INC.,

      Defendant.

UNPUBLISHED
November 13, 2025
10:31 AM

No. 369018
Wayne Circuit Court
LC No. 19-010015-CB

CAMBRIDGE REAL ESTATE, LLC, and
MICHAEL HAMAME,

      Plaintiffs-Appellees,

v

IAQ MANAGEMENT SERVICES, INC,

      Defendant-Appellant,

and

THE CINCINNATI INSURANCE COMPANY,

      Defendant.

No. 369081
Wayne Circuit Court
LC No. 19-010015-CB

Before: REDFORD, P.J., and FEENEY and BAZZI, JJ.

PER CURIAM.

-1-

In this consolidated appeal, defendants-appellants, the Cincinnati Insurance Company ("Cincinnati") and IAQ Management Services, Inc ("IAQ"), appeal by leave granted the trial court order denying defendants' various motions for summary disposition.[1] Among those motions for summary disposition, both defendants argued they were entitled to dismissal of plaintiffs' claims under MCR 2.116(C)(7) on the basis of release. We agree. Therefore, we reverse the trial court's order denying summary disposition in defendants' favor and remand for entry of an order dismissing plaintiffs' complaint.

## I. BASIC FACTS

In July 2019, plaintiffs-appellees, Michael Hamame and Cambridge Real Estate, LLC ("Cambridge"), filed a complaint against defendants, alleging claims of tortious interference with a contract, tortious interference with a business expectancy, and civil conspiracy. Plaintiffs' claims stem from defendants' handling of a water-loss insurance claim at a building owned by nonparty Village Plaza Holdings, LLC ("Village Plaza").

Village Plaza, a holding company whose sole member is Sam Hamame,[2] owned a commercial property ("the Property") located in Dearborn, Michigan. The Property consists of a 300,000 square foot commercial high-rise building that was leased out for office and retail tenants. Village Plaza insured the Property through Cincinnati. The policy included property coverage, commercial general liability coverage, and an endorsement that provided coverage for business interruption and extra expense.

Cambridge is a holding company whose sole member is Michael. Cambridge had a contract with Village Plaza to manage the Property, which included leasing the property, handling landlord/tenant disputes, and hiring maintenance. Cambridge also had a development agreement with Village Plaza to redevelop the Property into a mixed-use enterprise.

In January 2018, a water pipe burst and caused significant water damage to the building. Michael handled the insurance claim on behalf of Village Plaza, which included acting as the point of contact with Cincinnati, hiring contractors, and hiring a public adjuster to assist in the claim. Shortly after the water loss occurred, a contractor hired by Michael and Cambridge to mitigate the water damage cut into wet drywall without testing for the presence of asbestos. Mitigation efforts ceased, and Cincinnati hired IAQ, an industrial hygienist consulting company, to test for possible asbestos exposure. IAQ's initial testing confirmed the presence of asbestos. Thereafter, IAQ was retained by Cincinnati to conduct further testing and to develop a safety protocol for removing the asbestos.

---

[1] *Cambridge Real Estate, LLC v The Cincinnati Ins Co*, unpublished order of the Court of Appeals, entered January 10, 2024 (Docket No. 369018); *Cambridge Real Estate, LLC v The Cincinnati Ins Co*, unpublished order of the Court of Appeals, entered January 10, 2024 (Docket No. 369081).

[2] Sam Hamame is Michael Hamame's father. For clarity, we refer to both of these individuals by their first name throughout this opinion.

In February 2018, Michael, acting on behalf of Village Plaza, sent letters to the Property's tenants informing them that their leases had been terminated. The letter explained that the building's heating, cooling, and water system needed to be suspended for at least 120 days to clean areas affected by asbestos and to avoid the possible spread of asbestos into occupied spaces. Although Village Plaza terminated the leases, several tenants remained on the premises at least through May 2018. During this time, mitigation efforts were halted and IAQ did not complete testing or develop the safety protocol.

Ultimately, mitigation efforts at the building remained stalled, and Cincinnati did not adjust the claim. There was a disagreement regarding the amount of loss sustained. Michael, acting on behalf of Village Plaza, negotiated a Settlement Agreement and Release with Cincinnati. On July 12, 2018, Village Plaza and Cincinnati entered into the Settlement Agreement and Release "to avoid the expense and disruption potentially arising out of their disagreement and to avoid any possible litigation related to the Claim and Village Plaza's request for coverage of the Policy." In exchange for $8.95 million (in addition to the amount Cincinnati had already paid to Village Plaza during adjustment of the claim), the parties agreed to enter a release of liability.[3]

The document provided, in relevant part:

As part of the consideration to Cincinnati for the Settlement Amount, *Village Plaza for itself and each of its* officers, directors, owners, partners, members, stockholders, employees, principals, *agents*, attorneys, controlling persons, insurers, reinsurers, parent companies, subsidiaries, affiliates, heirs, successors, and assigns (collectively hereinafter the "Releasors") agree to forever release and discharge *Cincinnati and its respective* officers, directors, owners, partners, members, stockholders, employees, principals, *agents*, attorneys, controlling persons, insurers, reinsurers, parent companies, subsidiaries, affiliates, heirs, successors, and assigns (collectively hereinafter the "Releasees") from any and all claims, demands, liabilities, obligations, losses, damages, and causes of action that the Releasors, or anyone claiming on their behalf, ever had, now have, or in the future may have, whether fixed or contingent, liquidated or not, known or unknown, suspected or unsuspected, based on, arising out of, or directly or indirectly relating to: the Claim; any claims for insurance coverage that Village Plaza has asserted or could have asserted with respect to the Claim; damage to the Building, including but not limited to repair costs, asbestos investigation or asbestos remediation, and claims under the property coverage of the Policy for lost rental or other income or any expense whatsoever related to the Claim or damage to the building. The types of claims released herein include, but are not limited to, claims for: insurance coverage; damages under Michigan statutes and Michigan common law; injunctive relief; common law and statutory bad faith; attorneys fees; equitable contribution; equitable subrogation; insurance benefits; unfair trade practices; and any form or theory of recovery, or cause of action whatsoever based in tort, contract, or otherwise. It is expressly understood and agreed, however, that

---

[3] The total amount paid to Village Plaza by Cincinnati with the release was $9,965,687.50.

this Paragraph 2 does not apply to any claims or damages related to the liability insurance coverage portion of the Policy. [Emphasis added.]

Sam, on behalf of Village Plaza, and Cincinnati signed the Settlement Agreement and Release. Plaintiffs did not sign it.

Over a year later, after Village Plaza had released all claims on its own behalf, and its agents, on July 25, 2019, plaintiffs filed this action alleging defendants conspired together to interfere with Cambridge's contracts with Village Plaza by misrepresenting that the tenants needed to be removed to address the asbestos issue. Plaintiffs alleged that Cincinnati, through its adjuster, threatened to deny Village Plaza coverage if it did not terminate the leases. According to plaintiffs, Cincinnati insisted on termination of the leases to reduce the amount payable under the insurance policy and to "squeeze" Village Plaza out of business. Plaintiffs further alleged that IAQ misrepresented the necessity of evacuation and acquiesced to Cincinnati's decision to remove the tenants out of a self-motivated interest to continue its profitable business relationship with Cincinnati. According to plaintiffs, defendants were aware of plaintiffs' contracts and development plans with Village Plaza and interfered with those contracts and business expectancies.

Defendants answered plaintiffs' complaint and filed affirmative defenses. Cincinnati generally denied that its adjuster required Village Plaza to terminate the leases. Instead, Cincinnati insisted its adjuster only requested the temporary removal of tenants from the premises while the asbestos issue was ongoing. The parties conducted discovery, which included the deposition of individuals involved in the ownership and operation of the Property and the individuals involved in the insurance claim. Thereafter, Cincinnati filed six separate motions for summary disposition. IAQ filed three motions for summary disposition and concurred in the motions filed by Cincinnati. As relevant to this appeal, defendants moved for summary disposition under MCR 2.116(C)(7) on the basis that plaintiffs' claims were barred by the release Village Plaza entered with Cincinnati. Defendants also moved for summary disposition under MCR 2.116(C)(10) on the basis that plaintiffs were unable to establish the elements of tortious interference with a contract, tortious interference with a business expectancy, or civil conspiracy against defendants. Plaintiffs opposed these motions. At a hearing on the motions, the trial court denied each of defendants' motions after explaining there was a factual dispute whether defendants told Village Plaza to terminate its leases. The trial court did not expressly address defendants' release arguments at the hearing or in the order denying the motions. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). The proper interpretation of a contract is a question of law this Court reviews de novo. *Titan Ins Co v Hyten*, 491 Mich 547, 553; 817 NW2d 562 (2012).

Defendants moved for summary disposition under MCR 2.116(C)(7). Summary disposition under MCR 2.116(C)(7) may be granted "because of release." In *Dextrom v Wexford Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010), this Court explained:

When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate.

## III. ANALYSIS

Defendants argue the trial court erred by denying their motions for summary disposition under MCR 2.116(C)(7) on the basis that plaintiffs' claims are barred by the Settlement Agreement and Release. We agree.

There is no dispute that Village Plaza and Cincinnati entered the Settlement Agreement and Release on July 12, 2018, in which Village Plaza broadly released any and all claims the releasors have or may have related to the insurance claim against Cincinnati and the listed releasees. However, the parties dispute whether the scope of the release included plaintiffs and their claims against defendants. Contract law governs disputes involving the scope of a release. *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 374; 838 NW2d 720 (2013). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties." *Id*. (quotation marks and citation omitted). The scope of the release is governed by the intent of the parties as expressed in the release. *Id*. If the language of the release is unambiguous, it must be construed as a whole and according to its plain and ordinary meaning. *Id*. A release is not ambiguous merely because the parties dispute its meaning. *Xu v Gay*, 257 Mich App 263, 272; 668 NW2d 166 (2003).

The plain language of the release shows that Village Plaza intended plaintiffs and their claims against defendants to be within its scope. The release was not limited to claims Village Plaza may have against Cincinnati, but claims "releasors" may have against Cincinnati and the other listed "releasees." In relevant part, "releasors" was defined to include Village Plaza's "agents." The release does not define the term "agent." Therefore, "a dictionary may be used to determine the ordinary meaning of a word or a phrase." *Greenville Lafayette, LLC v Elgin State Bank*, 296 Mich App 284, 292 n 4; 818 NW2d 460 (2012). *Black's Law Dictionary* (12th ed) defines an agent as "[s]omeone who is authorized to act for or in place of another" and the related term "agency" as "[a] fiduciary relationship that arises when one person (a principal) manifests assent to another (an agent) that the agent will act on the principal's behalf, subject to the principal's control, and the agent manifests assent or otherwise consents to do so."

Plaintiffs were Village Plaza's agents and, therefore, fell under the definition of "releasors." The agent and principal relationship between plaintiffs and Village Plaza is made abundantly clear by the record. Sam Hamame, sole owner of Village Plaza, was uninvolved with management of the Property. Instead, Village Plaza had a contractual relationship with Cambridge to manage the Property, and Cambridge was owned solely by Michael. According to Michael's own testimony, "Cambridge provided everything to Village Plaza" including management,

maintenance, and leasing. This sentiment was echoed by Sam's deposition testimony in which Sam recalled few details about the operation of the Property his company owned, but explained that he relied on Michael and Cambridge to lease up the Property, handle tenant issues, hire accountants and maintenance crew, and even pay themselves.

This agent-principal relationship is further demonstrated by Michael's extensive involvement in the insurance claim and settlement. Again, Sam was not personally involved in the water-loss claim. He relied on Michael to handle all aspects of the insurance claim on behalf of Village Plaza, including acting as the point of contact with Cincinnati, engaging public adjusters to assist Village Plaza in the water-loss claim, and requesting advances of payment on behalf of Village Plaza. Michael also handled the termination of the leases for Village Plaza during the water-loss claim. He was involved in drafting the letter sent to tenants to terminate their leases and signed the letter as Village Plaza's "Building Representative." Finally, Michael negotiated the settlement with Cincinnati and had Sam's complete authority to settle on behalf of Village Plaza. According to Sam, Michael handled settlement negotiations up until the day Sam signed the Settlement Agreement and Release.

From this record, it is readily apparent that plaintiffs were Village Plaza's agents. However, plaintiffs insist they were not agents of Village Plaza, but "independent contractors." In support of their argument, plaintiffs rely on Cambridge's management contract and development contract with Village Plaza to assert that they were independent contractors rather than Village Plaza's agent. The management contract does identify Cambridge as an "independent contractor" in at least one paragraph. However, it also identifies Cambridge as Village Plaza's agent. Plaintiffs assume that the roles of independent contractor and agent are mutually exclusive. They are not. "One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." *Wiesner v Washtenaw Co Community Mental Health*, 340 Mich App 572, 583; 986 NW2d 629 (2022), quoting Restatement Agency, 2d, § 14N (1958). Plaintiffs' management contract obligated Cambridge to render its services to Village Plaza faithfully and diligently and provided Cambridge with the authority to enter contracts on Village Plaza's behalf. The management contract also supports that plaintiffs are Village Plaza's agent.

Even in this case, Michael appears to admit that he and Cambridge are Village Plaza's agents. In response to defendants' motions for summary disposition, Michael executed an affidavit on behalf of himself and Cambridge, in which he averred, "As Village Plaza's agents, we trusted defendants to act in Village Plaza's best interest." Given the relationship between plaintiffs and Village Plaza, plaintiffs had the authority to act on behalf of Village Plaza. Plaintiffs were Village Plaza's agents and fell under the definition of "releasors."

Likewise, plaintiffs' claims fall within the scope of the release. The release broadly applies to any and all claims, known or unknown; past, present, or future; that a releasor may have directly or indirectly related to the insurance claim. This includes claims of bad faith or unfair practices and claims in contract, tort or otherwise. In this case, plaintiffs have sued defendants for tortious interference and civil conspiracy arising out of their alleged mishandling of the insurance claim. Specifically, plaintiffs allege Cincinnati and IAQ ordered the removal of tenants from the building during the investigation of the asbestos issue and conspired to misrepresent to plaintiffs that such removal was necessary. These claims relate directly to the insurance claim. These claims can

even be construed as an attempt to reopen the insurance claim that was settled by the release, given that it involves the same underlying transaction, seeks to litigate any fault Cincinnati and IAQ may have for the closure of the Property, and measures its damages in terms of damage to the Property and its development. Consequently, plaintiffs' complaint also falls within the scope of the release.

There is a single-sentence "carveout" in the July 12, 2018 Settlement Agreement and Release. It was intended to exclude certain claims from the release of liability. The release states: "It is expressly understood and agreed, however, that this Paragraph 2 does not apply to any claims or damages related to the liability insurance coverage portion of the Policy." The release defined the "Policy" as the insurance policy Cincinnati issued to Village Plaza. That Policy, in addition to providing coverage for property insurance claims, provided specified coverage for liability that could be imposed against the insured. Stated otherwise, the carveout refers to claims that may be brought against Village Plaza.[4] This carveout does not apply to plaintiffs' claims. Plaintiffs were not insureds under the Policy, and cannot make a liability claim under the Policy. Moreover, the allegations in plaintiffs' complaint do not relate to the liability portion of the Policy. Instead, the complaint only concerns the property loss claim. Consequently, plaintiffs' claims were not excluded from the release.

IAQ was also intended to be included within the scope of the release of liability. The release included "Cincinnati and its . . . agents" in the definition of "releasees." The record reflects that IAQ was Cincinnati's agent in relation to the water-loss claim. Cincinnati hired IAQ as an industrial hygienist to conduct testing, assess the scope of the asbestos, and prepare a protocol for the abatement at the Property. IAQ acted at the direction of Cincinnati and only when authorized. This included releasing information only when directed by Cincinnati. Therefore, IAQ was Cincinnati's "agent" and was intended to fit within the scope of the release.

Plaintiffs also argue that they cannot be bound by the release because they are not signatories of the Settlement Agreement and Release. As a general principle, "a contract cannot bind a nonparty." *AFSCME Council 25 v Wayne Co*, 292 Mich App 68, 80; 811 NW2d 4 (2011) (quotation marks and citation omitted). However, a nonsignatory "can still be bound by an agreement pursuant to ordinary contract-related legal principles, including incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel." *Id*. at 81. Essentially, there are exceptions to the privity requirement that may bind a nonparty to a contract.

Plaintiffs are correct that they are nonsignatories of the agreement. However, the unique circumstance of this case is that plaintiffs negotiated the terms of the Settlement Agreement and Release on behalf of Village Plaza and were given Sam's complete authority to settle the claim. Plaintiffs negotiated a document that plainly included themselves within the scope of the release

---

[4] As context for this carveout, tenants had lawsuits pending against Village Plaza for wrongful termination at the time the parties negotiated the release. See *Cincinnati Ins Co v Village Plaza Holdings, LLC*, unpublished per curiam opinion of the United States District Court for Eastern District of Michigan, issued July 22, 2020 (Case No. 18-12044).

and now seek to avoid application of the release. This would render the release's language defining who, beyond Village Plaza, qualifies as a "releasor" meaningless.

There is a closeness in proximity between Village Plaza and Cambridge that necessitates the imposition of a veil-piercing/alter ego theory. Generally, Michigan law respects the corporate form and our courts recognize and enforce separate corporate entities. *Gallagher v Persha*, 315 Mich App 647, 653-654; 891 NW2d 505 (2016). However, this legal fiction may be disregarded to avoid fraud or injustice. *Green v Ziegelman*, 310 Mich App 436, 451; 873 NW2d 794 (2015).

"There is no single rule delineating when the corporate entity may be disregarded." *Glenn v TPI Petroleum, Inc*, 305 Mich App 698, 716; 854 NW2d 509 (2014) (quotation marks and citation omitted). Rather, an "entire spectrum of relevant fact forms the background for such an inquiry." *Id*. (quotation marks and citation omitted). Factors that may be considered by this Court included "(1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham." *Id*.

In this case, the Property was owned by Village Plaza, an entity which existed to hold title to the Property. Village Plaza's sole member was Sam. Village Plaza had a management contract with Cambridge to operate the Property. Cambridge, which was also a holding company, had Michael as its only member. Sam is Michael's father. Sam bought the Property because Michael told him about its availability and the possibility of them developing it for profit. Sam's deposition testimony showed that he had little knowledge of how his business was run. He was unaware of who the tenants were at the time of the water loss and was not sure if rental income from the tenants was the Property's only source of income.

Sam testified that he was uninvolved with the daily operation of the Property and relied entirely on Michael and Cambridge to manage Village Plaza. He testified that Michael primarily controlled the Chase bank account for Village Plaza as an entity. He relied on Michael to prepare Village Plaza's accounting books and records for the Property. He even relied on Michael to pay the monthly management fee to Cambridge and did not know if Village Plaza had paid Cambridge that fee. In his own deposition testimony, Michael testified that he never took a management fee while Village Plaza was being developed and he was never paid a management fee. He explained Cambridge "provided everything to Village Plaza," which in this case included handling the insurance claim and settling the claim on Village Plaza's behalf.

This testimony demonstrates a close proximity between Village Plaza and Cambridge. These entities did not deal with each other at arm's length or follow corporate formalities. More than managing the Property, Michael was responsible for and directly involved in Village Plaza as an entity. Michael raised the possibility of purchasing the Property and developing it for profit to Sam. Village Plaza's only bank account was primarily administered by Michael, and Michael was responsible for maintaining Village Plaza's financial records and books. Michael had a level of dominion and control over Village Plaza as an entity that far surpassed his role as manager of its Property. This level of control was further corroborated by Michael handling Village Plaza's water-loss claim and negotiating the Settlement Agreement and Release.

Plaintiffs handled the entirety of the water-loss claim and were fully authorized by Sam to negotiate the settlement. As a product of those negotiations, Cincinnati paid Village Plaza almost $10 million in exchange for Village Plaza and its agents releasing Cincinnati and its agents from liability. In this lawsuit, plaintiffs seek to unravel the very settlement they negotiated by pointing to the separation of the corporate entities that they did not respect in their own dealings with the Property and Village Plaza. For these reasons, we invoke the corporate veil/alter ego theory to conclude that plaintiffs are bound by the Settlement Agreement and Release.

Finally, plaintiffs argue a separate Settlement and Release the parties entered in March 2021 contained a "carveout," which gave plaintiffs the right to pursue their claims against defendants in this case. This argument is without merit. The Settlement and Release was negotiated in relation to the tenant lawsuits against Village Plaza, plaintiffs, and Cincinnati. The "carveout" in that release states "Cincinnati, Cambridge Real Estate, LLC and Michael Hamame reserve all of their past, present and future rights and defenses with respect to the above identified claims pending in the Cambridge Lawsuit." Plaintiffs ignore that the carveout reserves the parties' rights to pursue their claims and defenses. The Settlement Agreement and Release entered into between Village Plaza and Cincinnati is one of the defenses that survives the 2021 Settlement.

In conclusion, all parties to this appeal and plaintiffs' claims fall within the scope of the Settlement Agreement and Release. Although plaintiffs were not signatories to the release, they were the agents of Village Plaza and are thus bound by the settlement and release terms. Additionally, their conduct with Village Plaza demonstrated the necessity of applying a corporation veil/alter ego theory to bind them to the release. For these reasons, plaintiffs' claims are barred by the Settlement Agreement and Release. The trial court erred by denying defendants' motions for summary disposition under MCR 2.116(C)(7).[5]

---

[5] Because the Settlement Agreement and Release entitled defendants to reversal, we are not required to address the other arguments defendants raise on appeal. Regardless, we observe the following: Defendants' motion for summary disposition under MCR 2.116(C)(10) premised on plaintiffs' failure to make out claims for tortious interference with a contract, tortious interference with a business expectancy, and civil conspiracy. Accepting for purposes of reviewing a motion under MCR 2.116(C)(10) that defendants insisted on the termination of the tenant leases, we conclude plaintiffs cannot establish their tortious-interference claims. Plaintiffs failed to present evidence of "a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI Int'l, Inc v Intermet Int'l Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002) (quotation marks and citation omitted). Viewing the evidence in the light most favorable to plaintiffs as the nonmoving party, the evidence demonstrates that defendants' conduct in adjusting the insurance claim arose out of concern of limiting building patrons' exposure to asbestos and the legitimate business purpose of preventing liability claims for asbestos exposure against themselves and Village Plaza. See *Hope Network Rehab Servs v Mich Catastrophic Claims Ass'n*, 342 Mich App 236, 246; 994 NW2d 873 (2022). Because plaintiffs' tortious-interference claims fail, their civil conspiracy claim predicated on those claims must also fail. *Urbain v Beierling*, 301 Mich App 114, 132; 835 NW2d 455 (2013).

Reversed.  This case is remanded for entry of an order dismissing plaintiffs' claims with prejudice.  We do not retain jurisdiction.


/s/ James Robert Redford
/s/ Kathleen A. Feeney
/s/ Mariam S. Bazzi